IN THE MATTER OF: C.G.R. AND M.A.C.-R.

No. COA11-263

(Filed 18 October 2011)

**1. Termination of Parental Rights—grounds—neglect—failure to obtain stable and appropriate housing**

The trial court did not err by concluding a ground existed to terminate respondent mother's parental rights to her minor daughter based on neglect under N.C.G.S. § 7B-1111(a)(1). The findings sufficiently showed that it was unknown how long it would take respondent to obtain stable and appropriate housing.

IN RE C.G.R.

[216 N.C. App. 351 (2011)]

**2. Termination of Parental Rights—neglect—ongoing inability to maintain housing and employment—substantial risk of continued neglect**

The trial court did not err in a termination of parental rights case by concluding that respondent mother neglected her minor daughter. In light of respondent's prior neglect of her minor son and her ongoing inability to maintain housing and employment, the minor daughter was at a substantial risk of continued neglect.

**3. Termination of Parental Rights—physical, mental, or emotional impairment of juvenile—substantial risk of such impairment—failure to provide proper care, supervision, or discipline**

The trial court did not err in a termination of parental rights case by finding physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of respondent mother's failure to provide proper care, supervision, or discipline.

**4. Termination of Parental Rights—neglect—risk of future neglect**

The trial court did not err by concluding a ground existed to terminate respondent mother's parental rights to her minor son based on neglect. The trial court's findings regarding the risk of future neglect to the minor daughter given respondent's current circumstances applied equally to her minor son.

**5. Termination of Parental Rights—findings of fact—likelihood of repetition of neglect**

The trial court did not err in a termination of parental rights case by its findings of fact 25 through 29 regarding a substantial risk of physical, mental, or emotional impairment of the minor son as a consequence of respondent mother's failure to provide proper care, supervision, or discipline.

**6. Termination of Parental Rights—likelihood of repetition of neglect—findings of fact—unnecessary for determination**

The trial court did not err in a termination of parental rights case by its findings of fact 35 regarding respondent mother's statement against her interest, finding 36 regarding her significant contact with co-defendants in a criminal case following her release from jail, finding 38 regarding her difficulty meeting her monthly living expenses, and finding 40 that she had no support

**IN RE C.G.R.**

[216 N.C. App. 351 (2011)]

system. These findings were unnecessary to support the trial court's finding of likelihood of repetition of neglect.

Appeal by respondent from orders entered 14 December 2010 by Judge Beverly Scarlett in Chatham County District Court. Heard in the Court of Appeals 26 September 2011.

*Northen Blue, LLP, by Carol J. Holcomb and Samantha H. Cabe, for petitioner-appellee Chatham County Department of Social Services.*

*Mercedes O. Chut, for respondent-appellant mother.*

*Pamela Newell, for the guardian ad litem.*

MARTIN, Chief Judge.

M.R. (respondent) appeals from orders terminating her parental rights to her daughter, M.A.C.-R. (Mary), and her son, C.G.R. (Charlie). For the following reasons, we affirm the trial court's orders.

The Chatham County Department of Social Services (DSS) became involved with respondent in June 2007 when the Chatham County Sheriff's Department executed a search warrant to search the home in which respondent, five-year-old Charlie, respondent's boyfriend, E.S., and E.S.'s mother and brother lived. The officers discovered fifteen kilograms of cocaine, approximately $420,000 in cash, three firearms, ammunition, and numerous other items related to the packaging and sale of cocaine. Respondent was arrested and DSS took custody of Charlie. At the time of her arrest, respondent was about seven months pregnant with Mary.

DSS filed a petition dated 29 June 2007 alleging Charlie was a neglected juvenile and a dependent juvenile. In an order dated 9 August 2007, the trial court adjudicated Charlie as neglected. On 31 August 2007, while she was in jail, respondent gave birth to Mary. DSS took custody of Mary and filed a petition alleging Mary was a depend- ent juvenile. In an order dated 13 September 2007, the trial court adjudicated Mary as dependent. Following a custody review hearing in November, in an order dated 28 February 2008, the trial court relieved DSS of reunification efforts and efforts to prevent or eliminate the need for out-of-home placement.

Respondent was released from jail on 21 April 2008. In a motion dated 22 April 2008, DSS moved to terminate respondent's rights to her children. Following hearings in November and December 2008, by

order entered 14 January 2009, the trial court terminated respondent's parental rights to her children. The trial court found grounds existed to terminate respondent's parental rights to Mary because Mary was a dependent juvenile under N.C.G.S. § 7B-1111(a)(6) and to Charlie because Charlie was a dependent juvenile under N.C.G.S. § 7B-1111(a)(6) and a neglected juvenile under N.C.G.S. § 7B-1111(a)(1). Respondent appealed and, in an opinion filed 1 September 2009, this Court reversed the trial court's order as to both children because DSS had not alleged dependency as a ground to terminate respondent's parental rights to either child, and the trial court had not made the necessary findings to terminate respondent's rights to Charlie on the ground of neglect. *See In re C.R.*, 199 N.C. App. 615, 687 S.E.2d 318 (2009) (unpublished).

On remand, alleging several grounds under N.C.G.S. § 7B-1111(a), DSS filed new motions dated 18 September 2009 to terminate respondent's parental rights to both children. From April to October 2010, the trial court held several hearings on the new motion to terminate respondent's parental rights to Mary. On 14 December 2010, the trial court entered new orders terminating respondent's parental rights to both Mary and Charlie. As to Mary, its grounds were that respondent: (1) neglected Mary under N.C.G.S. § 7B-1111(a)(1); (2) willfully left Mary in foster care for more than twelve months without making reasonable progress in correcting the conditions which led to the removal of Mary from respondent's care under N.C.G.S. § 7B-1111(a)(2); and (3) is incapable of providing for the proper care and supervision of Mary such that Mary is a dependent juvenile under N.C.G.S. § 7B-1111(a)(6). As to Charlie, the trial court amended its previous order terminating respondent's parental rights by making additional findings without taking new evidence, and again concluding that respondent had neglected Charlie under N.C.G.S. § 7B-1111(a)(1).

---

**[1]** On appeal, respondent argues the trial court erred in concluding a ground existed to terminate her parental rights to Mary based on neglect under N.C.G.S. § 7B-1111(a)(1). We disagree.

In reviewing a trial court's order terminating parental rights, this Court must determine whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings support the trial court's conclusions of law. *In re S.N.*, 194 N.C. App. 142, 146, 669 S.E.2d 55, 58-59 (2008), *aff'd per curiam*, 363 N.C. 368, 677 S.E.2d 455 (2009). "The trial court's conclusions of

law are fully reviewable *de novo* by the appellate court." *Id.* at 146, 669 S.E.2d at 59 (internal quotation marks omitted).

Parental rights may be terminated where the parent has neglected the juvenile such that the court finds the juvenile to be a neglected juvenile within the meaning of N.C.G.S. § 7B-101. N.C. Gen. Stat. § 7B-1111(a)(1) (2009). A "neglected juvenile" is defined as

> [a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, *it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to . . . neglect by an adult who regularly lives in the home.*

N.C. Gen. Stat. § 7B-101(15) (2009) (emphasis added).

The trial court's order finding Mary neglected includes the following relevant findings:

> 10. [Mary] was impaired due to Respondent mother's neglect and is at a substantial risk of impairment and continued neglect as a result of Respondent Mother's failure to provide and maintain stable housing and maintain employment to support the minor child as of the time the petition was filed.

> 11. [Charlie], another child born to Respondent mother, . . . has been adjudicated a neglected child pursuant to [N.C.G.S. §] 7B-101(15) and was found to be neglected by Respondent mother when he was residing in her home.

> 12. [Charlie] was removed by [DSS] from Respondent mother and the father of [Mary] on or about June 29, 2007 after a drug raid occurred at the home where they lived. At the time of the drug raid Respondent mother was pregnant with [Mary] who was born during Respondent mother's incarceration.

> . . . .

> 17. During the drug raid, the following was found:

> > a. fifteen (15) kilograms of cocaine which had been compressed into bricks,

   b. a bench press which is commonly used to compress cocaine into bricks,

   c. cash counters, food wrappers and numerous items commonly used for the sale of drugs,

   d. $428,000.00 in U.S. currency,

      The majority of the money was found in the master bedroom. Money was also found underneath the cushions of the sofa. Some of the money had been compressed into bricks.

   e. Two loaded AR-15 style assault rifles and one loaded .38 caliber revolver. The revolver was located in the master bedroom on top of a piece of furniture.

   f. 13 kitchen sized trash bags were located in the laundry room of the home. Each trash bag was filled with empty cocaine kilogram wrappers having a lot of residue left in the wrappers.

18. The middle bedroom of the home was used exclusively for the drug operation and there was no evidence that anyone slept in that room. The house had a strong odor of cocaine inside. After the drug raid, all adult occupants of the . . . home were incarcerated and [Charlie] was placed in the non-secure custody of [DSS].

19. During the drug raid, it was discovered that [Charlie] was sleeping in a closet. . . . Respondent mother allowed [Charlie] to sleep in the closet although there was another bedroom in the home. . . .

20. [Mary] was born on August 31, 2007. [Respondent] saw [her] once at birth and once more while incarcerated . . . .

. . . .

23. Upon her release from . . . [j]ail, Respondent mother resumed residency with [E.S.'s] mother . . . and [E.S.'s] brother . . . in Siler City, North Carolina—both of whom were co-defendants in the drug charges.

. . . .

25. [After living with them for a brief period of time,] Respondent mother . . . move[d] to Pittsboro, North Carolina and moved in with a friend of [E.S.'s mother]. . . . Not long after moving

**IN RE C.G.R.**

[216 N.C. App. 351 (2011)]

in with [her], [E.S.'s mother's friend] was arrested on a drug charge and was ultimately deported. For a period of time, Respondent mother lived alone in the home that she [had] shared with [E.S.'s mother's friend].

26. Since her release from jail in April 2008, [respondent] has failed to maintain employment and housing.

27. Since her release from jail in April 2008, [respondent] has had the following different residences:

    a. a residence in Sanford with [E.S.'s] brother and mother for about one month[.]

    b. a residence in Staley with a friend for about 9-10 months[.]

    c. a residence on [street name and city] for about 6 months.

    d. a residence on [street name and city] for about 3 months.

    e. a residence on [street name and city].

    f. [W]hile renting a house on [street name] in Siler City, Respondent mother stated that she had been living in the home of a friend down the street.

    g. an unidentified residence in Wisconsin while working there on and off.

    h. currently living with a friend in North Carolina.

28. Since her release from jail, Respondent mother has had the following five (5) different jobs:

    a. [Name of restaurant] in Siler City for three months;

    b. [Name of restaurant] in Ash[e]boro and at [name of restaurant] for about 2 months;

    c. [Name of restaurant] in Pittsboro for about 6 months;

    d. [Name of industry]

. . . .

31. As of the last date of this hearing, September 24, 2010, [respondent] has been living with a friend in North Carolina and relatives in Wisconsin.

32. Upon losing her most recent job and home in Chatham County, Respondent mother returned to Wisconsin where she reports that she has work on a dairy farm.

33. [Respondent] . . . reports that she is living with relatives there. She now needs the assistance of others to meet her basic housing needs.

. . . .

36. It is unknown how long it will take for Respondent mother to obtain stable and appropriate housing if she returns to Wisconsin.

. . . .

38. Respondent mother likely had a violent relationship with [E.S.] She admitted that he had been physically abusive to her on two (2) occasions. These events occurred while [Charlie], [Mary's] brother, was in the home.

. . . .

40. Respondent mother has continued to make poor choices after her children were removed from her care. Upon being released from jail, she moved back in with the family who operated the cocaine operation that resulted in her arrest and guilty plea and the removal of her son; she then moved in with another friend of the same family who was arrested on drug charges; she has not maintained stable and appropriate housing for any significant period of time.

41. Respondent mother is dependent, and remains dependent, on others to meet her own basic needs.

. . . .

43. Respondent mother has demonstrated a lack of insight into the needs of [Mary] and her brother and into the difficulties [Mary's] brother [Charlie] has experienced as a result of her poor choices. Respondent mother has not shown insight into the needs of [Mary] or what [Mary] may experience if she is removed from the only home she has known and removed from her biological brother to be united with her (Respondent mother). Respondent mother has further failed to demonstrate insight into the ways she has impaired [Mary] by the choices she made that resulted in [Mary] being born while Respondent mother was incarcerated.

. . . .

47. The [industry] employment had been obtained by presenting false identification documents and false information on the application. . . .

Based on these findings, the trial court concluded

3. Criteria exist[] to terminate Respondent mother's parental rights [to Mary] . . . .

4. Grounds exist to terminate Respondent mother's parental rights under N.C.G.S. 7B-1111[a](1) in that Respondent mother has neglected the juvenile, and this court finds that the juvenile is a neglected juvenile within the meaning of G.S. 7B-101 in that she does not receive the proper care, supervision, or discipline from the juvenile's parent.

Respondent challenges Findings 26, 33, 36, 40, and 41.[1] We hold Findings 26 and 40 are supported by clear, cogent, and convincing evidence. Since her release from jail in April 2008, respondent has had five jobs and eight residences. Immediately following her release from jail, respondent temporarily lived with E.S.'s mother and brother, two of her co-defendants in the criminal charges stemming from the drug raid, and then, after living with a friend for another brief period, moved in with a friend of E.S.'s mother, who was arrested on drug charges and deported while respondent was living with her. While renting a house in Siler City, respondent stated that she had been living in the home of a friend down the street. Respondent currently lives with a friend while in North Carolina and relatives while in Wisconsin. We note respondent does not actually dispute that her housing and employment have been unstable; instead, she emphasizes she has had steady employment and contends her housing, with the possible exception of the brief period following her release from jail when she resided with E.S.'s mother and brother, has always been appropriate.

Finding 33, that respondent "now needs the assistance of others to meet her basic housing needs," and Finding 41, that respondent "is dependent, and remains dependent, on others to meet her own basic

---

1. Although respondent lists several findings she challenges from the trial court's order regarding Mary in subheadings throughout her brief, we address only those findings supporting the trial court's conclusion of neglect that respondent has challenged in argument in her brief. The remaining findings supporting the trial court's conclusion of neglect respondent has failed to address in argument, including Findings 19, 23, 25, and 43, are deemed supported by sufficient evidence and are binding on appeal. *See In re M.D.*, 200 N.C. App. 35, 43, 682 S.E.2d 780, 785 (2009).

needs," are also supported by clear, cogent, and convincing evidence. Since the termination of her employment with the industry, respondent has lived with relatives in Wisconsin and a friend in North Carolina.

Finding 36, that "[i]t is unknown how long it will take for Respondent mother to obtain stable and appropriate housing if she returns to Wisconsin," is also supported by clear, cogent, and convincing evidence. Respondent contends she "has a permanent offer to share a house with her cousin" in Wisconsin and that she had "made arrangements with her employer to rent a house on his farm [in Wisconsin] if she regains custody of [Mary and Charlie]." However, she testified that her cousins were planning to move. She testified that if there was no room for her in their new home, she would have to "rent her own place." She testified that, if there is not enough work for her at the ranch in Wisconsin, she would move to a different ranch, and that "many of [the ranchers] offer a house for the workers to live in." This testimony supports the trial court's finding that it is unknown how long it will take respondent to obtain stable and appropriate housing if she returns to Wisconsin.

[2] Respondent next argues the trial court erred in concluding that she neglected Mary. She argues that the record contains no evidence she could not care for Mary and Charlie at the time of the termination proceedings, that the trial court failed to consider her changed circumstances, and that her lack of stable housing and employment were not the basis for Mary being removed from her custody and were therefore improperly considered in the trial court's order terminating her rights to Mary. She also contends the prior adjudication of neglect of Charlie cannot support a finding of neglect at the time of the termination proceedings in the trial court's order terminating her rights to Mary and that the trial court therefore erred in terminating her parental rights to Mary. These contentions are without merit.

The determinative factors in terminating parental rights are "the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding.*" *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). However, when a child has been removed from the parents' custody before the termination proceeding, "the trial court must employ a different kind of analysis to determine whether the evidence supports a finding of neglect" at the time of the termination proceeding. *In re Shermer*, 156 N.C. App. 281, 286, 576 S.E.2d 403, 407 (2003). In this instance, "evidence of neglect by a parent prior to losing custody of a child—including an adjudica-

tion of such neglect—is admissible in subsequent proceedings to terminate parental rights." *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232. "The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *Id.* "In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to . . . neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7B-101(15). Section 7B-101(15) does not require that the juvenile actually "live" in the home; in cases where a child has never lived in the home, in determining whether to adjudicate the child as neglected, the trial court may consider whether there is a substantial risk of future abuse or neglect of the child based on the historical facts of the case. *See In re A.B.*, 179 N.C. App. 605, 610-13, 635 S.E.2d 11, 15-17 (2006). The trial court has " 'discretion in determining the weight to be given . . . evidence [of prior neglect of another child in the home].' " *In re McLean*, 135 N.C. App. 387, 395, 521 S.E.2d 121, 126 (1999) (quoting *In re Nicholson*, 114 N.C. App. 91, 94, 440 S.E.2d 852, 854 (1994)).

In its order terminating respondent's parental rights to Mary, the trial court found that Charlie, "another child born to Respondent mother," "has been adjudicated a neglected child pursuant to 7B-101(15) and was found to be neglected by Respondent mother when he was residing in her home." The trial court also made several findings about the drug raid and the living conditions to which Charlie had been subjected. Contrary to respondent's suggestion, the trial court had discretion to consider evidence of respondent's neglect of Charlie. *See* N.C. Gen. Stat. § 7B-101(15). Furthermore, the trial court's finding that Mary was a neglected juvenile was not based only on respondent's prior neglect of Charlie. The trial court made several findings concerning respondent's failure to maintain stable employment and housing and her continued dependence on others. In light of respondent's prior neglect of Charlie and her ongoing inability to maintain housing and employment as found by the trial court, the trial court's finding that Mary "is at a substantial risk of . . . continued neglect as a result of Respondent Mother's failure to provide and maintain stable housing and maintain employment" is supported by the evidence and findings. *See In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232.

**[3]** Respondent also contends the evidence fails to support a finding of a "physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to

provide proper care, supervision, or discipline." *In re Safriet,* 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (internal quotation marks omitted). This contention is without merit. The trial court found Mary "is at a substantial risk of impairment . . . as a result of Respondent Mother's failure to provide and maintain stable housing and maintain employment to support the minor child." We hold the unchallenged findings that Mary was removed from respondent's care immediately following her birth and that respondent "has not shown insight into the needs of [Mary] or what [Mary] may experience if she is removed from the only home she has known and removed from her biological brother to be united with [respondent]" support this finding. Because the trial court's conclusion that a ground exists to terminate respondent's parental rights is supported by its finding that Mary is a neglected juvenile, it is unnecessary to address the remaining grounds in the trial court's order terminating respondent's parental rights to Mary. *See In re Greene,* 152 N.C. App. 410, 416, 568 S.E.2d 634, 638 (2002) ("[A] valid finding on one statutorily enumerated ground is sufficient to support an order terminating parental rights." (internal quotation marks omitted)).

[4] Respondent also contends the trial court erred in concluding a ground existed to terminate her parental rights to Charlie based on neglect. We disagree.

The following findings in the trial court's order support its finding of neglect as to Charlie:

13. A Juvenile Petition was filed on July 2, 2007 and [Charlie] was adjudicated as a neglected Juvenile on August 9, 2007.

14. [Charlie] came into the care and custody of DSS when his mother and the people with whom she lived were arrested and incarcerated subsequent to a drug raid in the home. [Charlie] was in the home at the time of the drug raid.

. . . .

16. On June 28, 2007, the home . . . was raided. The officers who raided the home found the following: fifteen (15) kilos of cocaine with a street value of $22,000 per kilo, assault weapons, ammunition, ten cell phones, one cash counter, a bench press, digital scales, a food saver wrapping machine, wrapping material, notebooks and miscellaneous documents and approximately four-hundred and twenty thousand dollars ($420,000) in cash.

. . . .

23. Respondent mother placed [Charlie] in an injurious environment; she did not properly protect him nor did she properly supervise him. [Charlie] was a member of the household from which a major drug trade operated.

24. Respondent mother failed to provide for [Charlie's] needs by allowing him to sleep on a mattress in the closet of the master bedroom when there was another bedroom in the house that could have been used for the child's bedroom.

25. [Charlie] has been diagnosed with PTSD (Post Traumatic Stress Disorder). [Charlie] visited his mother while she was incarcerated. He experienced significant trauma as a result of this visit.

26. [Charlie] has suffered from nightmares; he is fearful of being taken away from his foster home . . . .

27. When [Charlie] first entered foster care, on a scale from one (1) to ten (10), his level of trauma was nine (9). Currently, his level of trauma is six (6). It will be a year or more before his trauma level is reduced to a two (2) or one (1).

28. The level of [Charlie's] trauma is so severe, that he will need a high level of care and attention, as well as a stable environment for years to come.

29. [Charlie] is impaired and has suffered significant trauma and is at a substantial risk of impairment as a result of respondent[']s[] neglect as of the time the petition was filed.

30. . . . [T]his court finds that it is likely that neglect of the juvenile would repeat if the juvenile were returned to the custody of his mother. In support of this ultimate finding, the court finds the following evidentiary facts:

. . . .

e. Since her release from jail in April 2008, [respondent] has failed to maintain stable housing or employment.

We first note the trial court's 14 December 2010 order from which respondent appeals "amended [its 14 January 2009 order terminating respondent's parental rights] without the receipt of additional evidence." Because a trial court must "make an independent determination of whether neglect authorizing termination of . . . respondent's parental rights existed at the time of the termination hearing," *see In*

*re Ballard*, 311 N.C. at 716, 319 S.E.2d at 233, the trial court should have considered new evidence on remand from this Court's decision reversing the trial court's prior order terminating respondent's rights to Charlie and Mary. However, the findings in the trial court's order adjudicating Mary as neglected are related to the existing conditions during the 2010 termination proceedings and apply equally to Charlie; we therefore find it unnecessary to remand the trial court's order finding Charlie neglected for consideration of evidence of changed circumstances and entry of additional findings. *Cf. In re Safriet*, 112 N.C. App. at 753, 436 S.E.2d at 902 (holding remand for findings unnecessary where all the evidence supported such findings).

With respect to the trial court's order terminating respondent's parental rights to Charlie, respondent contends the portion of Finding 23, that she "placed [Charlie] in an injurious environment; she did not properly protect him nor did she properly supervise him," is unsupported by the evidence. The trial court's unchallenged Finding 16, stating fifteen kilograms of cocaine, assault weapons, ammunition, and numerous other items related to the packaging and sale of cocaine were discovered in the home where Charlie lived, and unchallenged Finding 24, stating respondent "failed to provide for [Charlie's] needs by allowing him to sleep on a mattress in the closet of the master bedroom," support Finding 23. Furthermore, the evidence indicates respondent voluntarily moved herself and Charlie from Wisconsin to North Carolina with E.S. and chose to remain in E.S.'s mother's home when she suspected E.S. was involved in "something illegal." There is no merit to respondent's contention that Finding 23 is unsupported by the evidence.

Respondent also challenges portions of Finding 30, that, "it is likely that neglect of [Charlie] would repeat if [Charlie] were returned to . . . [respondent's] custody" and that, "[s]ince her release from jail in April 2008, [respondent] has failed to maintain stable housing or employment." As we have previously held with regard to identical findings in the trial court's order finding Mary neglected, the trial court's finding that respondent has failed to maintain stable housing and employment is supported by clear, cogent, and convincing evidence. Furthermore, the trial court's order as to Mary considered respondent's prior neglect of Charlie and found that, given her failure to maintain stable employment and housing and her continued reliance on others to meet her own needs, Mary was at "a substantial risk of . . . continued neglect." As discussed, the trial court's findings regarding the risk of future neglect to Mary given respondent's cur-

**IN RE C.G.R.**

[216 N.C. App. 351 (2011)]

rent circumstances apply equally to Charlie. Thus, we hold that Finding 30 is supported by clear, cogent, and convincing evidence.

Respondent also challenges Findings 25, 26, 27, 28, and 29. She contends these findings contradict findings from prior orders of which the trial court's order took judicial notice. However, the orders respondent contends are contradictory do not address Charlie's psychological health. The trial court's August and September 2007 orders make no findings related to this issue and its November 2007 and February 2008 orders make findings related only to Charlie's adjustment to his foster home, including that he has shown tremendous progress since being in foster care and that he is doing well in his foster home. Furthermore, Findings 25, 26, 27, 28, and 29 are based on testimony by Elizabeth Watson, a psychiatric nurse practitioner and clinical specialist in child and adolescent psychiatric nursing, who Charlie had been seeing on a weekly basis for over ten months at the time of the November and December 2008 termination proceedings. Ms. Watson testified that she diagnosed Charlie with PTSD due to the trauma brought about by the drug raid on his house and stated that Charlie was further traumatized during his visit with respondent while she was incarcerated. Ms. Watson also testified to Charlie's high level of trauma and testified that it would take him at least a year to make considerable progress in reducing his level of trauma. She stated that recovery from PTSD requires the patient to feel safe and that this would take a long time. Accordingly, Findings 25, 26, 27, 28 and 29 are supported by clear, cogent and convincing evidence. Moreover, we note respondent's arguments mainly point to what she contends is evidence contradictory to these findings, including testimony from and a lack of psychological diagnosis by a social worker who treated Charlie upon his placement in foster care and testimony from a psychologist. However, "our appellate courts are bound by the trial courts' findings of fact" that are supported by clear, cogent, and convincing evidence "even though the evidence might sustain findings to the contrary." *In re Montgomery*, 311 N.C. 101, 110-11, 316 S.E.2d 246, 252-53 (1984). Respondent's arguments are therefore overruled.

**[5]** In a related argument, respondent suggests there is no substantial risk of a physical, mental, or emotional impairment of Charlie as a consequence of her failure to provide proper care, supervision or discipline, supporting an adjudication of neglect. However, Findings 25 through 29 and the trial court's finding of the likelihood of a repetition of neglect support such a finding. *See In re Safriet*, 112 N.C. App. at 753, 436 S.E.2d at 902.

IN RE J.J.

[216 N.C. App. 366 (2011)]

**[6]** Finally, although respondent also challenges Finding 35 regarding a statement of respondent against her interest, Finding 36, that, as of the November and December 2008 hearings, following her release from jail, respondent had had "significant" contact with her co-defendants in the criminal case, Finding 38, that, as of the November and December 2008 hearings, respondent was "barely able to meet her monthly living expenses with income from her employment," and Finding 40, that, as of the November and December 2008 hearings, she had no support system, those findings are unnecessary to support the trial court's finding of likelihood of repetition of neglect in this case, and it is therefore unnecessary to address them.[2] *See In re T.M.,* 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006).

Affirmed.

Judges McGEE and CALABRIA concur.

———

2. Although respondent's brief also lists Findings 24 and 37 from the trial court's order regarding Charlie in subheadings in her brief, she fails to challenge them in argument, and they are therefore binding on appeal. *See In re M.D.,* 200 N.C. App. at 43, 682 S.E.2d at 785.