IN THE MATTER OF TAMARA BETH McLEAN

No. COA98-1457

(Filed 2 November 1999)

### 1. Child Abuse and Neglect— death of sibling—sufficiency of findings

In a child neglect action, findings of fact taken in their entirety were sufficient to support the conclusion that the child (Tamara) was neglected where the court found that the respondent parents intended to live in the home of the maternal grandparents where Tamara's sister, Katelynn, died; that her father had been convicted of causing the death of Katelynn; that although her mother had been advised that the death of Katelynn was by non-accidental means, she continued to support the claims of her husband (Tamara's father) that Katelynn's death was caused by being shaken as he ran with her to get help; that the parents were not cooperative with the social worker who was investigating the matter; that the respondent parents have neither expressed nor exhibited any concern for the future safety of Tamara in their home; and that the father extended most of the care for the juvenile during visits. The court carefully weighed and assessed the evidence and concluded that Tamara, then less than three months of age, would be at risk if allowed to reside with her parents in their home.

### 2. Child Abuse and Neglect— dispositional order—disassociation of mother from father

There was prejudicial error in a juvenile disposition order where the court made statements in open court (although not in the written order) about the mother's need to disassociate herself from the father where there were no findings that reasonable efforts to reunite the family would be futile, the statements made by the court could have left little doubt in the parties' minds that the separation of the parents was a pre-condition to the mother having a realistic chance to regain custody, and the integrity of the reasonable efforts process was further undermined by the statement of the trial court that it was only ordering reasonable efforts because it was required to do so.

**3. Child Abuse and Neglect— dispositional order—oral comments by judge—disapproved**

Statements by the trial court in a juvenile neglect action that referred to the family as ridiculous and that characterized the mother as abnormal were not approved even though they were made following the trial and the oral entry of adjudicatory and dispositional orders and there was no evidence of demonstrable prejudice during the trial.

**4. Child Abuse and Neglect— retention of jurisdiction**

The trial court erred in a juvenile neglect action by attempting to retain exclusive jurisdiction over future hearings. The legislature has not acted to grant authority to the trial court to retain jurisdiction in a domestic relations case, and, even if the court had had jurisdiction here, this portion of the dispositional order would have been vacated so that the appearance of neutrality could be preserved.

This is an appeal by respondent parents from a judgment entered 15 September 1998 by Judge Albert A. Corbett, Jr., in Harnett County District Court. Heard in the Court of Appeals 17 August 1999.

Sarah McLean (respondent mother) and Ronald Terrell McLean (respondent father) were the biological parents of Olivia Katelynn McLean (Katelynn), who was born in March of 1996. They were married following the death of Katelynn. Medical and autopsy reports indicated that three-month-old Katelynn died on 5 July 1996 due to "shaken-baby syndrome." The medical examiner's report indicated that there were both old and new manifestations of the syndrome. As there were no other children in the parents' home at that time, DSS closed the case.

On 24 February 1998 Tamara Beth McLean was born to the respondents in Harnett County. DSS filed a petition on 26 February 1998 which alleged that Tamara was a neglected juvenile because when she left the hospital she would be residing in the same home where Katelynn died due to non-accidental injuries; that at the time of Katelynn's death, she was in the sole care of her father, the respondent Ronald Terrell McLean; and that a charge of murder was pending against Ronald McLean in the death of Katelynn. The petition further alleged that Tamara would be living in an environment injurious to her welfare; that during the DSS investigation following Katelynn's death the respondent parents were uncooperative; that the mother

continued to support the father and refused to believe that the father had injured Katelynn; that Sarah McLean did not believe that the newly born Tamara would be in any danger if the infant were to be permitted to go home with her and Ronald McLean; and, finally, that the infant Tamara would be at risk if allowed to reside with her parents in their home. Based on the verified petition, a non-secure custody order was entered placing Tamara, who was then two days old, in the custody of DSS. As a result, the child has not resided with the respondents since her birth.

The case was tried on 8 May 1998, at which time all parties were present and represented by counsel. There was evidence that respondent father, Ronald McLean, pled guilty the previous day to involuntary manslaughter in the death of Katelynn, and that he would be sentenced later. The trial court found that placement of Tamara with her parents would be "against her welfare," and ordered that Tamara be placed in the custody of DSS, that the parents pay child support, and that the parents undergo psychological evaluation and testing. The trial court discussed with the parents in open court its concern about the respondent mother's continued cohabitation with the father, and told the mother that the "only chance" she had was to "separate [herself] from him . . . ." The trial court did not make that language a condition in its written order.

On 12 August 1998, the respondent father was sentenced in Harnett County Superior Court on the charge of involuntary manslaughter, and was placed on intensive probation. On 15 September 1998, the trial court entered its written adjudication and dispositional order, from which respondent parents appealed.

*E. Marshall Woodall for petitioner-appellee Harnett County Department of Social Services.*

*C. Winston Gilchrist for respondent-appellant Sarah McLean.*

*Richard E. Jester for respondent-appellant Ronald Terrell McLean.*

*Donald E. Harrop, Jr., for appellee Guardian Ad Litem.*

HORTON, Judge.

Respondent mother contends that (I) the evidence and findings of fact were insufficient to support the conclusion of the trial court that Tamara Beth McLean is a neglected juvenile. She also contends, as

does respondent father, that (II) the trial court erred in ordering DSS not to attempt to reunite her with Tamara unless she disassociates herself from respondent father. Respondent father argues that (III) the trial court was demonstrably prejudiced against respondents in this case, and that (IV) the trial court also erred in attempting to retain jurisdiction to hear future proceedings in this case.

I.

[1] Our Juvenile Code defines a neglected juvenile as

[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker . . . or who lives in an environment injurious to the juvenile's welfare . . . . In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C. Gen. Stat. § 7A-517(21) (Cum. Supp. 1997). In addition, the decisions of this Court require " 'there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide "proper care, supervision, or discipline' " in order to adjudicate a juvenile neglected. *In re Safriet*, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (listing cases holding that a substantial risk of impairment is sufficient to show neglect) (emphasis added)." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). Whether a child is "neglected" is a conclusion of law which must be supported by adequate findings of fact. *Id.* at 510, 491 S.E.2d at 676. Furthermore, the allegations of neglect must be proven by clear and convincing evidence in order to sustain such a finding. N.C. Gen. Stat. § 7A-635 (Cum. Supp. 1997). In this case, the trial court made the following findings of fact:

5. [Tamara Beth McLean] is a neglected juvenile as defined by N.C.G.S. § 7A-517 (21), respectively, in that:

A. The respondent parents of the juvenile herein were also the parents of Olivia McLean (hereinafter sometimes referred to as the infant) who died at 3½ months of age from [a] non-accidental injury.

B. The respondent parents were the sole caretakers of the infant from the time of her birth until she received the injuries which caused her death.

**IN RE McLEAN**

[135 N.C. App. 387 (1999)]

C. At the time of the death of the infant, she was residing with the respondent parents in the home of the maternal grandparents at Route 7, Box 915, Harnett County, North Carolina.

D. On the morning of July 1, 1996, the parents reported that the infant was alert and feeding with playful interaction at 4:30 and 8:30 a.m. At approximately 8:00 a.m., the respondent father transported the respondent mother to Triton High School where she was a student. At that time, the infant was with the respondent parents. The father returned home and was the sole caretaker until approximately 12:20 p.m. when he (father) ran for help with the infant in his arms.

E. The respondent father reported that he placed the infant in a car seat under a tree while he worked on an automobile. He further reported that she began to cry and was consoled by him. At approximately 12:20 p.m., the father observed the infant to be limp and did not appear to be breathing well. After telephoning the mother at school, the father ran down the road with the infant in his arms. The infant received CPR at a nursing home and was taken to Betsy Johnson Emergency Room by ambulance.

F. The respondent father reported no injury to the infant and that the only shaking received by her during the day of July 6, 1996 [*sic*] was the shaking received while he was running down the road with the infant in his arms.

G. The infant was placed on life support systems immediately upon her arrival at the Betsy Johnson Hospital in Dunn and continued on life support systems until July 5, 1996. At no time during this period did the infant regain consciousness and it was subsequently determined by the medical personnel that the child was brain dead and the life support systems were turned off on July 5, 1996 and the child immediately died.

H. Medical records from the University of North Carolina Hospitals—Chapel Hill dictated by Pediatric Attending physician Dr. Lewis Romer, M.D., give a final diagnosis of Shaken Baby Syndrome and Battered Child Syndrome.

I. An autopsy performed on the infant at the Office of the Medical Examiner in Chapel Hill by Dr. Karen Chancellor, M.D. indicated that the "death resulted from willfully inflicted head

trauma." The medical examiner ruled the death of Olivia McLean to be a homicide.

J. Olivia McLean died as a result of non-accidental trauma most likely caused by severe shaking of the child within the two and one half hours prior to the father's seeking medical attention approximately 12:20 p.m., July 1, 1996.

K. Physical examination of the child at UNC Hospital revealed positive clinical findings of ecchymosis (bruises) in the back of the buttock in the lumbar region that was yellowish green color consistent with old ecchymosis (bruises) approximately 5 to 10 days old. Respondent mother told the social worker that she saw the bruises the day before Olivia went to the hospital.

L. Dr. Runyon testified that the injuries to Olivia McLean were the result of a severe shaking causing the blood vessels in the spinal chord to separate. Dr. Runyon further testified that this injury could not have been caused by accidental means such as described by the respondent father. He further testified that the injuries to Olivia most likely occurred between 11:45 a.m. and 12:20 p.m. during which time the respondent mother was at school.

M. The child's death was the result of a severe shaking causing severe injuries to the child's brain which caused the child's death.

N. Shortly after the death of the infant, the respondent parents married and have continued to live together from that time until the trial of this case in the maternal grandparent's home at Route 7, Box 915, Dunn North Carolina.

O. During the investigation in July, 1996, the respondent parents were not cooperative with the social worker during the time in which she was making [an] investigation in this matter.

P. The respondent mother in July, 1996 presently continues to support the father in his contention that the child had not been injured except be shaken while he was running down the road with the child in his arms. At the time, the respondent mother was told that the medical personnel at Chapel Hill, N.C., were of the opinion that the infant died from means other than accidental.

Q. The respondent mother has continued to support the father's claim that the child was not shaken other than such shaking motions as received while he ran with the infant (Olivia McLean) for help.

R. After the infant's death, the social worker made attempts to visit the parents at the home of the maternal grandparents; the social worker sent a letter asking for an appointment and made telephone calls in an attempt to reach the parents. The social worker was not able to make the visit and eventually closed the investigative case for the reason that the child had died. James Beaumont, maternal grandfather of the deceased child testified that he tried on at least two occasions in July or August 1996 to return calls to the social worker and left messages, but did not receive a response.

S. Since the death of Olivia McLean, the respondent parents have married, had another baby (Tamara McLean) and are presently living together.

T. On the 26th day of February, 1998, the petitioner's social worker began an investigation in this juvenile case and visited with both of the respondent parents who continued their insistence that the death of the juvenile's sibling was accidental (the respondent mother does not believe the father intentionally hurt their deceased daughter) and further they did not respond to calls or letters from the social worker. The respondents' families have supported the respondents in their efforts. The maternal grandparents have been told that the medical personnel were of the opinion the infant's (Olivia's) death was caused by means other than accidental.

U. The respondent parents' plan for the care of the juvenile was to place her in the home of the maternal grandparents where the parents were currently living. This household is the same in which the deceased child was living when she died. During petitioner's investigation in February 1998, the social worker expressed concern about the juvenile's safety in the parents['] home. During the social worker's discussion with them, neither respondent parent exhibited or expressed any concern for the juvenile's safety and both parents supported each other.

V. During the parents' visits with the juveniles [*sic*] since the filing of the petition herein, the respondent mother seemed

awkward and nervous with the child and the respondent father extended most of the care for the juvenile during the visits.

W. The juvenile's safety cannot be assured if placed with the respondent parents.

Where the trial court sits without a jury and hears the evidence in a neglect adjudication, the facts found by the trial court are binding on an appellate court if supported by clear and convincing competent evidence. *Helms*, 127 N.C. App. at 511, 491 S.E.2d at 676. In this case neither appellant takes exception to any of the findings of fact made by the trial court. Appellant mother argues, however, that the findings made by the trial court do not support the conclusion that Tamara is a neglected child. She argues that the trial court impermissibly based its decision entirely upon the death of Tamara's sibling Katelynn prior to Tamara's birth, as evidenced by the trial court's third conclusion of law in which it stated that "the juvenile [Tamara] is a neglected juvenile as defined by N.C.G.S. § 7A-517(21) in that the juvenile was born to parents of another juvenile who died as a result of abuse at the hands of the respondent father and the household composition of the respondent parents remains the same as when the first juvenile was killed."

Under the definition of "neglect" in effect at the time this action was commenced, the trial court is allowed to consider as relevant evidence that a "juvenile lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7A-517(21). Here, the neglect petition was filed while the newly born Tamara Beth McLean was still in the hospital maternity ward, so that she had not actually lived in the home with her parents, the respondents. However, the trial court found that Katelynn died while living with her parents in the home of the maternal grandparents. The trial court also found that following the death of Katelynn, the respondents married and continued to live in the home of the maternal grandparents. Finally, the trial court found that the respondents' plan of care for Tamara was to have her live with them in the home of the maternal grandparents, the same home in which Katelynn was living when she died.

The purpose of the statutory amendment is self-evident: it allows the trial court to consider the substantial risk of impairment to the remaining children when one child in a home has been subjected to abuse or neglect. Here, the plan of her parents was to take Tamara to the same home, to live among the same persons, as did her deceased

sister Katelynn. We are aware that Tamara was not living in the home at the time Katelynn died. However, under these circumstances, respondents' plan to have Tamara live in the same home environment in which Katelynn died was a relevant factor which the trial court could consider in making a determination of whether there was a substantial risk of impairment to her.

We are aware that while the abuse of a child in the home is clearly relevant in determining whether another child is neglected, the statute "does not *require* the removal of all other children from the home once a child has either died or been subjected to sexual or severe physical abuse." *In re Nicholson and Ford*, 114 N.C. App. 91, 94, 440 S.E.2d 852, 854 (1994) (emphasis added). In *Nicholson*, the juveniles before the trial court were the siblings of a child who had died of a blunt trauma and shaken-baby syndrome. The parents, who rejected the medical findings, were charged with manslaughter. While charges were eventually dropped against the mother, the father pled guilty to involuntary manslaughter and was later convicted. When the father was released from jail and returned home, DSS filed a petition alleging both children to be neglected in that they resided in an environment injurious to their welfare. The trial court dismissed the petition as to the three-and-one-half-year-old sibling but found neglect as to the three-month-old sibling, noting that "shaken-baby syndrome is most deadly to infants under six months of age." *Nicholson*, 114 N.C. App. at 93, 440 S.E.2d at 853. In affirming the decision of the trial court, we held that removal of other children from a home in which a sibling died by non-accidental means is not mandatory; the statute "affords the trial judge some discretion in determining the weight to be given such evidence," and allows the trial court some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside. *Id.* at 94, 440 S.E.2d at 854.

The facts in the case before us are strikingly similar to those in *Nicholson*. Here, there is ample evidence that Katelynn died due to shaken-baby syndrome, but her parents contended that her death was accidental; Katelynn's mother married the respondent father after Katelynn's death, and feels comfortable in having him assist in the care of Tamara; the father has now been convicted of involuntary manslaughter in the death of Katelynn, but continues to live in the home; the mother and her parents continue to support the father in his version of the events surrounding Katelynn's death. We particularly note that at the time of the 8 May 1998 adjudicatory hearing in

this matter, Tamara was less than three months of age and thus at high risk for a non-accidental injury such as "shaken-baby syndrome." Finding that the home environment remained unchanged since the death of Katelynn and that the family did not share or understand the State's concern for the safety of Tamara, the trial court concluded that Tamara was neglected as a matter of law.

In cases of this sort, the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case. In the case before us, the trial court found that the respondent parents intended to live with Tamara in the home of the maternal grandparents where Katelynn died; that her father had been convicted of causing the death of Katelynn; that although her mother had been advised that the death of Katelynn was by non-accidental means, she continued to support the claims of her husband, Tamara's father, that the death of Katelynn was caused by her being shaken as he ran with her to get help; that the parents were not cooperative with the social worker who was investigating the matter; that the respondent parents have neither expressed nor exhibited any concern for the future safety of Tamara in their home; that during the visits of the parents with the child, the respondent father "extended most of the care for the juvenile."

Here, the trial court carefully weighed and assessed the evidence, and concluded that Tamara—then an infant less than three months of age—would be at risk if allowed to reside with her parents in their home. Because the neglect statute "affords the trial judge some discretion in determining the weight to be given such evidence," we hold that the findings of fact taken in their entirety are sufficient to support the conclusion that Tamara was a neglected child. This assignment of error is overruled.

## II, III, and IV

Because the remaining three assignments of error relate to statements made by the trial court following oral entry of the adjudicatory and dispositional orders, we discuss them together. After adjudicating Tamara to be a neglected child, the trial court held a dispositional hearing, and considered written reports filed by DSS and the Guardian Ad Litem, as well as oral testimony from witnesses called by the respondent father. The trial court was also advised that the father pled guilty the preceding day to involuntary manslaughter in the death of Katelynn and would be sentenced at a later date. The trial

court then outlined a dispositional order under which DSS would be granted legal and physical custody of Tamara, with a review hearing scheduled after six months. Visitation with the parents was to be scheduled by DSS. The trial court then made the following statements to the mother and father in open court:

> You know, ya'll must think I'm crazy. This child was obviously killed in 1996 by, ma'am, I['m] going to give you the benefit of the doubt, by him. You have supported him since then. I think it is totally ridiculous for you and your family to come up here and tell me [it was] an accident. There is no accident. It's a vicious act where a child was killed. I have no patience with it. The idea, and I'm going to tell you now, I am not giving you or anybody any child involving a death like this unless you totally and completely disassociate yourself from the person who did it. . . . The only chance you have, if at all, is separate yourself from him, get in the psychological evaluation and satisfy me and your family that you are going to totally dissociate [*sic*] your person from and that you are totally going to completely totally support that child. Today I do not have that feeling. . . .

Mr. Jester, to your client, taking him a long time to come around to the fact that he's done something. He's not cooperated with Social Services and done anything. Now he comes into court and pleads guilty, involuntary manslaughter for the death of a child, shows as far as I'm concerned, no remorse, no understanding, still with his wife. I'm mortified that his wife is even still with him. I think most normal people would have disassociated themselves from him a long time ago, let him go his way. He has killed one child. Am I going to let him kill another one? No, if I can help it. [At the] [s]ame time[,] Mr. Jester, I'm going to give him the benefit of six months just like I am her. I'm not going to rule him out yet, totally and completely but he needs to get—We'll see about the evaluations.

Social Services doesn't need to get too bogged down with all of these plans and worries and things and trying to cooperate. It's a very marginal situation, at best. I'm telling you now, if ya'll going to make plans for them to stay together and have this child, forget it. I'm not going to do it. . . . Your advice would be to separate your self [*sic*] completely, totally and give me the feelings you['re] going to totally and completely support your child. If I don't have that feeling there's somebody else that will. That concludes this hearing.

After a colloquy with counsel about child support, the trial court made the following statements to DSS representatives:

> So, the visitation[s] are . . . to be supervised, you're to be careful what you're doing. Ya'll have got too carried away with this, reasonable efforts. Ya'll need to break track a little bit. This is a very serious matter and it's marginal at best but I'm going to give them six months to try. The only reason because the law requires me to do it. If it won't for that, that would be it.

## II. Order that Mother Separate From Respondent Father

**[2]** Both respondent parents contend that the trial court erred in instructing DSS not to attempt to reunite Tamara with her mother, unless her mother "disassociates" herself completely from her husband. Normally, DSS is under an obligation to make reasonable efforts to prevent or eliminate the need for placement of a juvenile in foster care, unless the trial court "finds through written findings of fact that efforts to eliminate the need for placement of the juvenile in custody clearly would be futile or would be inconsistent with the juvenile's safety and need for a safe, permanent home within a reasonable period of time . . . ." N.C. Gen. Stat. § 7A-651(c)(2) (Cum. Supp. 1997). Here, there were no findings in the dispositional order that reasonable efforts to reunite the family would be futile, nor did the trial court incorporate any of its oral statements about the need for the mother to distance herself from her husband if she were to have any chance of regaining custody of Tamara. However, the statements made by the trial court in open court could have left little doubt in the parties' minds that the separation of the parents was a pre-condition to the mother having a realistic chance to regain custody.

The integrity of the reasonable efforts process was further undermined by the statement of the trial court that it was only ordering reasonable efforts because it was required to do so by law. That the trial court had the ability to carry out its directives was emphasized when the trial court expressly retained jurisdiction of the case in the written dispositional order it signed. Certainly it is reasonable to expect DSS to abide by the oral directives of a trial court which is going to retain jurisdiction in a matter, and thus will be the same trial court conducting review hearings in the matter. Thus, although the trial court did not expressly state its conditions in the written order, we believe that its statements in open court, coupled with the retention

of jurisdiction in the matter, were prejudicial error. As a remedy for this error, we have vacated below that portion of the dispositional order retaining jurisdiction in this trial court.

### III. Prejudice Demonstrated by Trial Court

[3] It is the combination of these post-trial events which led respondent father to argue on this appeal that the trial court was "demonstrably prejudiced" against respondent parents. We note that the objectionable statements were made *following* the trial of this matter and the trial court's oral entry of adjudicatory and dispositional orders. We have carefully searched the record, and do not find evidence of "demonstrable prejudice" against respondents *during the trial of this case.* However, in order that our trial courts retain the confidence of the citizens who bring their cases there for decision, the process of decision making must not only be fair, but must appear to be fair. Although the tragic circumstances surrounding the death of Katelynn no doubt contributed to the frustration of the trial court and its post-trial statements, we cannot approve statements that refer to the family as "ridiculous," or characterize the respondent mother as abnormal.

### IV. Retention of Jurisdiction

[4] Finally, we address the argument that the trial court erred in attempting to retain jurisdiction of future hearings in this case. While we are aware that as a matter of practice some trial courts have done this for reasons of consistency and efficiency, particularly in family law cases, there is no express statutory authority for this practice. This Court has previously discussed the practice in a child custody case in which the trial judge retained jurisdiction. *Wolfe v. Wolfe,* 64 N.C. App. 249, 307 S.E.2d 400 (1983), *disc. review denied,* 310 N.C. 156, 311 S.E.2d 297 (1984). In *Wolfe,* this Court held that the trial court's effort to retain exclusive jurisdiction was erroneous and impractical, but found that the action was harmless error in the absence of evidence of some prejudice to the defendant in that case.

Although domestic practice has changed dramatically since *Wolfe* was decided in 1983, the legislature has not acted to grant authority to the trial court to retain jurisdiction in a domestic relations case. By contrast, the legislature has given the trial court the authority to retain jurisdiction when a defendant is placed on unsupervised probation as part of a criminal judgment. The trial judge may "limit

jurisdiction to alter or revoke the sentence . . . ." N.C. Gen. Stat. § 15A-1342(h) (1997). If the trial judge limits jurisdiction in that fashion, only the sentencing judge may reduce, terminate, continue, extend, modify, or revoke unsupervised probation, provided the sentencing judge is still on the bench. N.C. Gen. Stat. § 15A-1344(b) (1997). Therefore, the trial court in this case erred in attempting to retain exclusive jurisdiction over future hearings in this matter and that portion of the dispositional order must be vacated. In any event, we believe the trial court's post-trial statements already discussed herein, could be interpreted as an indication that the trial court had already formed an opinion about the order it intended to enter at future review hearings. Thus, even if the trial court had authority to retain jurisdiction over future hearings, a concept we reject herein, we would vacate that portion of the dispositional order so that the appearance of neutrality and impartiality could be preserved.

In summary, we affirm the adjudication of neglect by the trial court, modify the dispositional order by vacating the provision relating to the retention of jurisdiction by the trial court, and affirm the written dispositional order as modified.

Affirmed as modified.

Judges GREENE and TIMMONS-GOODSON concur.