STROUD, Judge.
*42 Respondent appeals from an order terminating his parental rights to his child M.P.M. (hereinafter referred to as "May") on the ground that he neglected the juvenile.[1] See N.C. Gen.Stat. § 7B-1111(a)(1) (2013). Respondent contends that the trial court erred in (1) making certain findings of fact; and (2) concluding that Respondent neglected May at the time of the termination hearing and *689 that there was a likelihood of repetition of neglect. We affirm.
I. Background
In 1999, Arlington County Department of Social Services in Virginia took Arnold, Mother's son, into custody. A court in Arlington County adjudicated Arnold to be abused and neglected, and on or about 24 October 2000, the court terminated Mother's parental rights as to Arnold. In 2001, Margaret was born, and in 2003, Carl was born. In 2003, Mother began a romantic relationship with Mr. F. While on probation in Virginia, Mother and Mr. F. moved to Mecklenburg County. In 2005, Katie was born.
In 2006, Mother and Mr. F. were arrested in Mecklenburg County for absconding from their probation. They were extradited to Virginia where they began serving prison sentences for grand larceny by credit card fraud. On or about 1 September 2006, Mecklenburg County Department of Social Services took Margaret, Carl, and Katie into custody. On or about 18 October 2006, a district court in Mecklenburg County adjudicated the juveniles to be neglected and dependent. In December 2006, while in prison, Mother gave birth to Lance. In February or March 2007, Mr. F. was released from prison and moved back to Mecklenburg County. In 2008, Mr. F. gained custody of Margaret, Carl, Katie, and Lance. In July 2009, Mother was released from prison and, in August 2009, she returned to Mecklenburg County.
On or about 14 August 2009, Katie was hospitalized for severe injuries she sustained from being beaten while in the care of Mr. F. Mr. F. coached the juveniles on what to say when asked how Katie was injured. Mecklenburg County Department of Social Services again took custody of Margaret, Carl, Katie, and Lance, and a district court in Mecklenburg County adjudicated the juveniles to be abused, neglected, and dependent. Mother entered into a service agreement with Mecklenburg County Department of Social Services to work toward regaining custody of her children.
*43 In September 2009, Mother moved from Mecklenburg County to Guilford County. In May 2010, Mother began a romantic relationship with Respondent. Shortly thereafter, Mother and Respondent began living together. In November 2010, Mecklenburg County Department of Social Services returned Margaret, Carl, Katie, and Lance to Mother. May, the subject juvenile of this case, was born in February 2011, and Respondent was subsequently determined by DNA paternity testing to be her biological father.
During the period from November 2010 to October 2012 while the juveniles resided with Mother and Respondent, Mother habitually physically and emotionally abused May's four half-siblings. This abuse included beating them, hitting them with items such as shoes, belts, and metal hangers, kicking them in the stomach, screaming at them, and grabbing and pulling them by the hair. Mother often held her hand over the children's mouths and noses to prevent them from screaming while she beat them. She also often put her foot on their backs to hold them down on the floor so they could not escape. During one incident when Respondent attempted to intervene on behalf of Carl, Mother told him that Carl was her child and that he could leave if he did not like the way she disciplined him. Respondent did leave the home, leaving his daughter May with Mother, and returned the next morning.
At some point between November 2010 and October 2012, Respondent began participating in the abuse of May's four half-siblings. On one occasion, as punishment for playing with matches, Respondent and Mother held Carl's face close to a hot burner. On other occasions, Respondent hit the children with shoes, and on at least one occasion, Respondent hit the children with a copper wire.
On 1 October 2012, Mother threatened to strike Carl with an axe. The following day, Margaret disclosed to a social worker the incident with the axe and the daily abuse inflicted upon the children. On or about 3 October 2012, Guilford County Department of Health and Human Services ("DHHS") gained custody of all five juveniles. On 19 December 2012, Respondent signed a service agreement that addressed emotional and mental health, parenting, family relationships, housing, and employment matters. On *690 7 January 2013, the trial court adjudicated Margaret, Carl, Katie, and Lance to be abused, neglected, and dependent and adjudicated May to be neglected and dependent. The trial court awarded Respondent one hour of supervised visitation per week. On 23 January 2013, the trial court directed DHHS to proceed with termination of parental rights. On 20 March 2013, DHHS filed a petition to terminate *44 the parental rights of Respondent as to May and the parental rights of Mother as to all five children.
Respondent took a parenting psychological evaluation with Dr. Michael McColloch and a pre-psychiatric evaluation, but he failed to comply with Dr. McColloch's recommendation for a full psychiatric evaluation, because he made it clear that he was unwilling to take any medications, which may be recommended as a result of the evaluation. The parenting psychological evaluation noted "personality difficulties," including depressive, avoidant, and schizoid characteristics.
During a session with his individual therapist, Respondent denied that he had ever hit the children. At the time of the filing of the petition in March 2013, Respondent agreed to move out of Mother's home and to cease all contact with Mother. But Respondent continued to call, text, and send photographs of May to Mother, which he took during his visits with May, until October 2013 when Robert McEntire, the DHHS social worker in charge of the case, discovered their continued contact. During this period, Respondent repeatedly falsely reported to McEntire that he was having no contact with Mother. After McEntire confronted Respondent, Respondent explained that "he felt sorry for her" and that "she ha[d] suffered enough." Respondent also stated that he could resume his relationship with Mother if he was certain that she had her anger under control, and that the risk of harm to his daughter if she were left alone with Mother "would be no different than leaving her with a babysitter or someone else because you can't predict what someone will do." In April 2014 during a visit with May, Respondent stated that he was open to leaving May in Mother's care during the day because "she would never hurt her."
The trial court conducted the termination hearing on 11 August 2014, 8 September 2014, 9 September 2014, and 7 October 2014. On 12 December 2014, the trial court concluded that Respondent had neglected May, that Respondent neglected May at the time of the termination hearing, and that there is a likelihood of repetition of neglect should Respondent regain custody of May. See N.C. Gen.Stat. § 7B-1111(a)(1). The trial court also concluded that termination of his parental rights was in May's best interest. The trial court further concluded that Mother neglected all five children and that termination of her parental rights was in their best interest. Respondent gave timely notice of appeal.
*45 II. Termination of Parental Rights
A. Standard of Review
Termination of parental rights proceedings are conducted in two stages: adjudication and disposition. In the adjudication stage, the trial court must determine whether there exists one or more grounds for termination of parental rights under N.C. Gen.Stat. § 7B-1111(a). This Court reviews a trial court's conclusion that grounds exist to terminate parental rights to determine whether clear, cogent, and convincing evidence exists to support the court's findings of fact, and whether the findings of fact support the court's conclusions of law. If the trial court's findings of fact are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary. However, the trial court's conclusions of law are fully reviewable de novo by the appellate court.
In re A.B., --- N.C.App. ----, ----, 768 S.E.2d 573, 575 (2015) (citations, quotations marks, and brackets omitted).
B. Findings of Fact
Respondent contends that the following findings are not supported by clear, cogent, and convincing evidence:
(1) Since [May] has been in custody, [Respondent] never demonstrated that he learned anything from therapy in terms of how he would keep [May] safe in the future.
*691 To the contrary, [Respondent] has continued to believe that allowing [Mother] to watch [May] while he works is a viable option. [Respondent's] explanation for his contact with [Mother] was that he felt sorry for her and that she "has been through enough." [Respondent's] conduct and statements reveal that his concern for [Mother] is greater than his desire to reunify with [May].
....
(3) It is clear that [Respondent] has not gained an adequate understanding of what unfolded during his relationship with [Mother], the seriousness of what transpired in *46 that home, and the role he played in creating and fostering an injurious and abusive environment for his daughter.
(4) [Respondent's] testimony and history reveal that he is unable or [un]willing to protect [May] from abuse and harm, particularly if doing so would require excluding [Mother] from [May's] life. [Respondent] does not have a protective instinct for his child that is strong enough to overcome his need to submit to a dominant personality. [Respondent] lacks the ability to protect [May] from a dominant personality such as that of [Mother].
Respondent argues that the evidence showed that he followed his case plan by establishing paternity, undergoing mental health evaluations, engaging in parent-centered therapy, completing his individual therapy to his therapist's satisfaction, establishing a home apart from Mother, eventually ceasing contact with Mother, and engaging in regular, appropriate and affectionate visitations with May. He submits that this evidence showed that he had demonstrated "sufficient growth as a parent to merit a chance at reunification with his daughter." Our dissenting colleague agrees with Respondent and takes the position that Respondent is being punished for Mother's actions. Although we agree that Respondent may be a better parent than Mother and that he made some progress, that is not the question before us. The trial court properly addressed the concerns about each parent separately. Ultimately, the trial court based its decision primarily upon Respondent's failure to understand or appreciate the extent and effects of Mother's established pattern of child abuse and his inability to protect May. And this is why Mother's history of child abuse is relevant to the determination about Respondent.
We hold that clear, cogent, and convincing evidence supports the challenged findings of fact. See id. at ----, 768 S.E.2d at 575. McEntire, the DHHS social worker who had worked on this case since October 2012 when the children came into DHHS custody, testified that, during a session with his individual therapist, Respondent denied that he had ever hit the children. McEntire also testified that, after DHHS had filed its petition in March 2013 and Respondent had agreed to cease all contact with Mother, Respondent continued to call, text, and send photographs of May to Mother, which he took during his visits with her, until October 2013 when McEntire discovered their continued contact. McEntire testified that during this period, Respondent repeatedly falsely reported to him that he was having no contact with Mother. McEntire further testified that after he confronted Respondent, Respondent explained that "he *47 felt sorry for her" and that "she ha[d] suffered enough." McEntire also testified that Respondent stated that he could resume his relationship with Mother if he was certain that she had her anger under control, and that the risk of harm to his daughter if she were left alone with Mother "would be no different than leaving her with a babysitter or someone else because you can't predict what someone will do." McEntire further testified that, in April 2014 during a visit with May, Respondent stated that he was open to leaving May with Mother during the day because "she would never hurt her." Finally, McEntire testified that he was concerned that Respondent failed to comprehend the dangers or risks involved in resuming a relationship with Mother or allowing May to remain alone with Mother.
In addition, although Respondent did have a parenting psychological evaluation and a pre-psychiatric evaluation, he failed to comply with Dr. McColloch's recommendation for a full psychiatric evaluation, because he made it clear that he was unwilling to take any medications, which may be recommended as *692 a result of the evaluation. The parenting psychological evaluation noted "personality difficulties," including depressive, avoidant, and schizoid characteristics. Accordingly, we hold that clear, cogent, and convincing evidence supports the challenged findings of fact. See id., 768 S.E.2d at 575.
C. Conclusion of Law
Respondent next contends that the trial court erred in concluding that Respondent neglected May at the time of the termination hearing and that there was a likelihood of repetition of neglect. To terminate parental rights pursuant to N.C. Gen.Stat. § 7B-1111(a)(1), the trial court must conclude that the parent has abused or neglected the juvenile. N.C. Gen.Stat. § 7B-1111(a)(1). N.C. Gen.Stat. § 7B-101(15) defines a "neglected juvenile" as
[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has *48 been subjected to abuse or neglect by an adult who regularly lives in the home.
Id. § 7B-101(15) (2013) (emphasis added).
"A finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." In re Young, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997). The trial court must consider evidence of any changed circumstances since the time of a prior adjudication of neglect and the probability that the neglect will be repeated if the child is returned to the parent's care. In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). In predicting the probability of repetition of neglect, the court "must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." In re McLean, 135 N.C.App. 387, 396, 521 S.E.2d 121, 127 (1999).
Here, the trial court made the following findings of fact in support of its conclusion of neglect:
36. Grounds exist to terminate the parental rights of [Respondent] pursuant to N.C.G.S. § 7B-1111(a)(1). [Respondent] has neglected the juvenile [May], the neglect continues to date, and there is a likelihood of the repetition of neglect if [May] were returned to [Respondent]. [Respondent's] past neglect includes his use of inappropriate discipline on [May's] older siblings with [May] in the home, including hitting the siblings with sandals and assisting [Mother] in holding [Carl's] face close to a hot burner and his failure to protect [May] from the abusive environment of the home he shared with [Mother]. [Respondent] demonstrated a lack of protective instinct and allowed his relationship with [Mother] to dominate over the safety of his child and her siblings. [Respondent] demonstrated poor parenting judgment by leaving the residence during [Carl's] beating and not taking protective measures such as contacting police or at least removing his own child. When [Respondent] was asked why he did not take the children or at least [May] with him, [Respondent] responded that he did not want to make [Mother] angry. [Respondent's] own fear caused him to leave his daughter and her siblings alone with a violent perpetrator, revealing that his fear is greater than his protective instinct. [Respondent's] neglect of [May] has been *49 ongoing through the present and he is currently neglecting [May] as indicated below.
k. [ (sic) ] [Respondent] was not fully forthright and honest with Dr. McColloch or his therapist as required to adequately address his issues. In the report of the Parenting/Psychological Evaluation performed on [Respondent], Dr. McColloch noted that [Respondent] was convincing in his assertion that he could end his relationship with [Mother] and that he had no problem with not *693 having contact with her. Despite appearing convincing to Dr. McColloch, [Respondent] did not cease his contact with [Mother]. Furthermore [Respondent] did not disclose to Dr. McColloch that he had participated in the abuse by hitting [May's] siblings with items such as a sandal and by assisting [Mother] in holding [Carl's] face close to a hot burner. [Respondent] also did not inform his individual therapist of his continued contact with [Mother] until after the Social Worker informed the therapist of the contact and the therapist confronted [Respondent].
l. From the outset of the case, [Respondent] was allowed to have supervised visitation with [May] for one hour once a week. Although [Respondent] requested that the Court increase his visits, the Court declined to do so during the two years [May] has been in custody. The Court in the underlying juvenile proceeding never increased [Respondent's] visits and never advanced [Respondent] to having unsupervised visits. It is clear that the Court in the underlying juvenile proceeding determined that [Respondent] had not reached a point where he could safely and effectively have unsupervised visits with [May].
m. It is clear that [Respondent] complied with the requirements of his service agreement in terms of attending appointments and completing tasks. However, the particular circumstances of this case require more than going through the motions of attending ten therapy sessions and interacting appropriately during one hour weekly supervised visitation sessions. When asked during this trial what he learned from his individual therapy, [Respondent's]
*50 response was only that he learned to be patient with the children and to give them things. [Respondent] has not learned that his first responsibility is to protect his daughter. While patience is an important parenting skill, the most crucial parenting skill for the children in this case is to be protected from harm and to be made to feel safe.
(1) Since [May] has been in custody, [Respondent] never demonstrated that he learned anything from therapy in terms of how he would keep [May] safe in the future. To the contrary, [Respondent] has continued to believe that allowing [Mother] to watch [May] while he works is a viable option. [Respondent's] explanation for his contact with [Mother] was that he felt sorry for her and that she "has been through enough." [Respondent's] conduct and statements reveal that his concern for [Mother] is greater than his desire to reunify with [May].
(2) The Court observed [Respondent] throughout all of the hearing dates for this trial and throughout all of the testimony that was relayed during this trial. [Respondent] showed no emotion and a complete lack of empathy during the testimony describing what the children went through in his home. At the close of the evidence on grounds, when the Court announced its decision that grounds exist to terminate the parental rights of each of the parents, [Respondent] smiled. Upon seeing this, the Court specifically asked [Respondent] if he understood the Court's decision and [Respondent] responded in the affirmative and offered no explanation for his inappropriate expression.
(3) It is clear that [Respondent] has not gained an adequate understanding of what unfolded during his relationship with [Mother], the seriousness of what transpired in that home, and the role he played in creating and fostering an injurious and abusive environment for his daughter.
*51 (4) [Respondent's] testimony and history reveal that he is unable or [un]willing to protect [May] from abuse and harm, particularly if doing so would require excluding [Mother] from [May's] life. [Respondent] does not have a protective instinct for his child that is strong enough to overcome his need to submit to a dominant personality. [Respondent] lacks the ability to protect [May] from a dominant personality such as that of [Mother].
*694 n. There is a likelihood of the repetition of neglect by [Respondent]. It is reasonably foreseeable that [Respondent's] neglectful behaviors would continue and that he would again allow [May] to live in an injurious environment if [May] were returned to him. Prior to removal, [Respondent] did not believe that [Mother] or the abusive environment in his home posed a risk to [May's] physical or emotional well-being. It is clear from his testimony during this hearing that, despite the therapy he received and the juvenile court proceedings he has participated in, [Respondent] continues to believe that is true.
We hold that the above findings of fact support the trial court's conclusion of law that Respondent neglected May at the time of the termination hearing and that he was likely to repeat the neglect. DHHS removed May from Respondent and Mother's home, because Respondent and Mother severely abused May's siblings. But as discussed above, during an individual therapy session, Respondent denied that he had ever hit the children. From April 2013 to October 2013, Respondent repeatedly reported that he had no contact with Mother, when, in fact, he was calling, texting, and sending her photographs of May. Additionally, Respondent stated that he still believes that allowing Mother to watch May during the day is an appropriate option.
Respondent specifically asserts that the trial court's findings of fact that during the termination hearing, Respondent "showed no emotion and a complete lack of empathy" and that he inappropriately smiled do not support its conclusion of neglect. But "[a]ll of the findings of fact regarding respondent's in-court demeanor, attitude, and credibility ... are left to the trial judge's discretion." In re Oghenekevebe, 123 N.C.App. 434, 440-41, 473 S.E.2d 393, 398-99 (1996). The trial court properly considered respondent's in-court demeanor in determining whether *52 Respondent properly appreciated the harmfulness of his and Mother's prior abuse. In fact, in this particular case, the trial court's evaluation of Respondent's credibility and demeanor was crucial to the issues presented, but even upon our review of the cold written record, the reasons for the trial court's findings on these facts are entirely supported by the evidence.
Given the severity of Mother and Respondent's abuse of May's siblings, Respondent's dishonesty with respect to his role in the abuse and his continued contact with Mother, and Respondent's continued lack of understanding of the danger that Mother poses to May, we hold that the trial court did not err in determining that "there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." See McLean, 135 N.C.App. at 396, 521 S.E.2d at 127. Accordingly, we hold that the findings of fact support the trial court's conclusion of law that Respondent neglected May at the time of the termination hearing and that there was a likelihood of repetition of neglect.
III. Conclusion
For the foregoing reasons, we affirm the trial court's order terminating Respondent's parental rights.
AFFIRMED.
Judge GEER concurs.
Judge TYSON dissents.

We use pseudonyms to protect the identity of the juveniles.