IN THE SUPREME COURT OF NORTH CAROLINA

No. 272A19

Filed 17 July 2020

IN THE MATTER OF: M.C., M.C., M.C.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 29 April 2019 by Judge Joseph Moody Buckner in District Court, Orange County. This matter was calendared in the Supreme Court on 19 June 2020 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Stephenson & Fleming, LLP, by Deana K. Fleming, for petitioner-appellee Orange County Department of Social Services.*
>
> *Parker Poe Adams & Bernstein LLP, by Tiffany M. Burba and Spencer J. Guld, for appellee Guardian ad Litem.*
>
> *Richard Croutharmel for respondent-appellant mother.*

HUDSON, Justice.

Respondent appeals from the trial court's orders terminating her parental rights to M.C. (Megan), M.C. (Miranda), and M.C. (Margot).[1] We affirm.

Respondent and the children's father, Walter, were married in September 2010. Miranda was born in February 2012. Respondent and Walter divorced in April

---

[1] Pseudonyms have been used to protect the identity of the juveniles and for ease of reading.

2013, though they maintained an "on and off" relationship subsequent to the divorce. Megan was born in August 2016.

On 15 February 2017, Orange County Department of Social Services (DSS) received a report alleging neglect of Miranda and Megan due to their exposure to domestic violence. The report alleged Walter was verbally abusive, possessed a firearm, and that respondent was afraid for her life. Walter was arrested and charged for this incident. The report also alleged there had been an incident during the previous week where Walter pushed respondent against a wall and punched her in the face. When Miranda attempted to intervene, Walter threw her across the room. Law enforcement was not notified of that incident.

As a result of the report, DSS conducted an assessment and decided to provide in-home services to the family. DSS determined there was a history of domestic violence. Respondent had obtained five previous domestic violence protective orders (DVPOs) against Walter, though each was subsequently violated, and she obtained a sixth following the February 2017 incidents. As part of a safety plan, DSS mandated respondent and Walter have no contact for three months. Services were recommended to address the domestic violence, respondent's mental health, and Walter's substance abuse.

As with the previous DVPOs, Walter violated the sixth, and respondent became pregnant with Margot during the mandated no-contact period. In June 2017, respondent informed her social worker that she had resumed her relationship with

Walter and that services were no longer needed. Respondent and Walter moved back in together on 19 June 2017.

On 21 June 2017, Walter became enraged because respondent lost her wallet, and he told her over the phone that he would put her "in the ground." When he subsequently showed up at her workplace, the police were called, and Walter was arrested for violating the DVPO. Respondent amended her DVPO to prevent Walter from contacting her or the children.

On 27 June 2017, DSS filed juvenile petitions alleging Miranda and Megan were neglected but allowed the children to remain in respondent's physical custody. On 12 July 2017, respondent entered into a consent order with DSS in which she agreed to have no contact with Walter. On 1 August 2017, respondent's social worker learned that respondent went to the emergency room on 21 July 2017, accompanied by Walter and the children. The social worker also learned that respondent was staying at the apartment she had previously shared with Walter, though she claimed to be staying with her mother. DSS took Miranda and Megan into non-secure custody on 2 August 2017. They were placed in the home of their maternal grandmother.

Following a hearing on 17 August 2017, Miranda and Megan were adjudicated to be neglected juveniles. The trial court concluded it was in the best interests of the children for DSS to maintain custody and allowed respondent one hour of visitation with the children per week. The court also ordered respondent to complete a mental health assessment and follow all recommendations, to sign a release for her

treatment providers to release relevant information to DSS, and to abide by the DVPO against Walter.

Walter was incarcerated for violating the DVPO from the end of July 2017 to November 2017. During that period, respondent was "highly engaged" and attended weekly visitations with the children, as well as a weekly domestic violence support group and monthly therapy sessions.

Margot was born in January 2018. Because respondent was progressing with her case plan and "on track for reunification," DSS did not remove Margot from her care. Respondent continued to make progress throughout the beginning of 2018. She continued therapy, started a parenting program, and claimed to be "done" with Walter. DSS expanded respondent's visitation with Miranda and Megan, allowing respondent to be supervised by her mother instead of DSS and to visit the children in their grandmother's home.

On 22 March 2018, respondent was seen with Walter in the DSS parking lot. When confronted by her social worker the next day, respondent admitted having been in contact with Walter since December 2017. She also admitted she and Walter had argued in the car after leaving the DSS parking lot, and she had left Margot in the car with Walter following the argument. As a result of these admissions, DSS filed a petition alleging Margot was a neglected juvenile and obtained non-secure custody the same day.

Following Margot's removal, both parents appeared to make efforts toward reunification. They agreed to not contact each other but indicated their ultimate goal was reunification as a family. Less than one month after Margot's removal, however, respondent and Walter were seen at a funeral together. DSS was informed they arrived together and held hands during the ceremony.

In the weeks that followed, Walter was repeatedly observed driving respondent's car. DSS was aware respondent and Walter continued seeing each other during the summer of 2018 and advised respondent that her relationship with Walter would prevent reunification with her daughters. Despite these warnings, the relationship continued.

After a permanency planning hearing on 16 August 2018, the trial court changed the children's primary permanent plan to adoption with a secondary plan of reunification. DSS moved the children from their placement with respondent's mother into an adoptive foster home.

After the permanency planning hearing, DSS lost contact with Walter, and he ceased all services with the agency. Respondent continued to report that she and Walter were still together. On 30 October 2018, respondent told her social worker that her relationship with Walter was stable and free of violence. At their next weekly meeting, the social worker learned that Walter had threatened to kill respondent on 29 October 2018 and 30 October 2018 and had threatened to burn down her apartment on one of those occasions. Respondent sought another DVPO in November

2018. Respondent again reported to DSS that she was not seeing Walter anymore and would not allow his presence to keep her from getting her children back.

Police saw Walter and respondent together in her car at her apartment complex on 13 November 2018. The officers spoke with her, but respondent and Walter left together in her car before the officers could serve Walter with the DVPO. Two days later, the property manager at respondent's apartment complex saw Walter enter respondent's apartment alone and called the police. Respondent later reported that she had given Walter a key. On 1 December 2018, two days after Walter was served with the DVPO, respondent called the police to report that Walter had taken her debit card and her car. Respondent later reported she had previously given him the PIN for the debit card. Police were waiting for Walter when he arrived back at the apartment. He became aggressive toward the officers, was arrested, and charged with violating the DVPO and resisting arrest.

On 16 November 2018, DSS filed motions to terminate respondent's and Walter's parental rights to each of the children. Following a hearing on 21 February 2019, the trial court adjudicated grounds to terminate respondent's and Walter's parental rights to the children. The court further concluded that the termination of respondent's and Walter's parental rights was in the best interests of the children. Respondent appeals.[2]

---

[2] Walter did not appeal the trial court's orders and is not a party to this appeal.

Termination of parental rights consists of a two-stage process: adjudication and disposition. N.C.G.S. §§ 7B-1109, -1110 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S. § 7B-1109(f)).

On appeal, respondent argues the trial court erred in adjudicating the existence of grounds to terminate her parental rights under N.C.G.S. § 7B-1111(a)(1), (2), and (6). As "an adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights," *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019), we need only to address respondent's arguments as to the ground of neglect under N.C.G.S. § 7B-1111(a)(1).

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.*, 372 N.C. at 392, 831 S.E.2d at 52 (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). "[A]ppellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *In re Montgomery*, 311 N.C. at 110–11, 316 S.E.2d at 252–53. Unchallenged findings are deemed binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). "Moreover, we review only those [challenged]

findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58–59 (2019). The trial court's conclusions of law are reviewed de novo. *In re N.D.A.*, 373 N.C. 71, 74, 833 S.E.2d 768, 772 (2019).

A neglected juvenile is one "whose parent, guardian, custodian, or caretaker; does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (2019). Termination of parental rights for neglect "requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167 (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)).

Respondent challenges several of the trial court's findings of fact. She first contends there is no evidence to support the trial court's finding of fact 35 and 37[3] that she and Walter had dinner together for his birthday. While there was no testimony at the termination hearing related to the dinner meeting, the social worker's adjudicatory hearing report, admitted into evidence without objection,

---

[3] The trial court entered a separate termination order for each child, which resulted in differences between the numbering of the findings of fact in 17 JT 39 and 17 JT 40 with 18 JT 19. As such, respondent's challenges to a single finding of fact refer to two numbers, both of which we include. Because the orders contain findings of fact and conclusions of law which are essentially identical, any quotes are from a representative order entered in file number 17 JT 39.

describes multiple meetings between respondent and Walter, including the birthday dinner, in violation of the no-contact orders and DVPOs. Respondent does not challenge the court's findings concerning these additional meetings between respondent and Walter, including their appearance together at a funeral and a court hearing, as well as Walter's ongoing use of respondent's car and his presence in her apartment.

Assuming, *arguendo*, the evidence is insufficient to support the trial court's finding about the shared birthday dinner, the remaining unchallenged findings establish respondent's continued engagement with Walter, notwithstanding the DVPOs and voluntary consent orders. Accordingly, the erroneous finding is not necessary to support the trial court's legal determination that grounds existed for the termination of respondent's parental rights. *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58–59.

Respondent next challenges the trial court's finding of fact 47 and 49:

> It is likely that the neglect experienced by the juvenile in the care of Respondent mother will repeat or continue if the juvenile is returned to Respondent mother's care and custody. Specifically, this court finds the following facts:
>
> . . . .
>
> b. Respondent mother minimizes the risk to herself, the juvenile, and her siblings.
>
> c. Respondent mother has had contact with Respondent father despite DVPO's she sought, agreements not to have contact, and orders of this court as set forth herein.

    d. Respondent mother has engaged in and completed several domestic violence education and support groups with the Compass Center, but she continued to maintain a relationship with Respondent father.

    e. Respondent mother has engaged in individual therapy, but she continued to have contact with and maintain a relationship with Respondent father.

    f. Respondent mother's continued relationship with Respondent father despite engagement in services and no contact orders, and failure to maintain a safe home free from domestic violence subjects the juvenile to the likelihood of repetition of neglect if the juvenile were returned to her care and custody.

Respondent argues her testimony at the termination hearing contradicts the finding that she minimizes the risk to herself or the children. At the hearing, she acknowledged it was a "terrible decision to get back together with [Walter] in March 2018 and she was sorry for having done so." She testified that she was no longer in a relationship with Walter, and she would not return to him again.

Respondent also challenges the trial court's finding that there would be a likely repetition of neglect if the children were returned to her care. She asserts her trial testimony, as well as Walter's possible incarceration for offenses with long prison sentences, are evidence of changed circumstances at the time of the termination hearing, which the trial court failed to consider in its findings.

Respondent cites *In re A.B.*, 253 N.C. App. 29, 799 S.E.2d 445 (2017), to support her assertion that the trial court failed to make adequate findings related to the

evidence of changed circumstances. In that matter, the Court of Appeals determined "the trial court's findings and conclusions do not adequately account for respondent-mother's circumstances at the time of the termination hearing." *Id.* at 38, 799 S.E.2d at 452. In that case both a social worker and the respondent "presented testimony that would support additional findings up to the time of the termination hearing," and the Court "believe[d] the evidence would support different inferences and conclusions regarding the likelihood of a repetition of neglect based on evidence regarding respondent-mother's circumstances at the time of the hearing." *Id.* at 35, 799 S.E.2d at 451. That testimony included evidence of the respondent's (1) unbroken period of negative drug screens, (2) participation in therapy, (3) separation from the children's father and her obtaining a DVPO against him, (4) full-time employment, (5) consistent and appropriate visitation with her children, and (6) her willingness and ability to meet minimal living standards for the children, all of which had been at issue at the adjudication hearing. *Id.* at 36–37, 799 S.E.2d at 451–52.

At the time of the termination hearing in this matter, Walter was in jail on pending felony and misdemeanor charges. This, along with respondent's testimony that she was no longer in a relationship with Walter and would not return to him, is the extent of the changed circumstances respondent presented. At the outset, the trial court heard respondent's evidence of purported "changed circumstance," but it "was not required to credit [respondent's] testimonial evidence, particularly in light of

other testimony admitted during the hearing." *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019) (citing *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68).

Further, "[i]n predicting the probability of repetition of neglect, the court 'must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case.' " *In re M.P.M.*, 243 N.C. App. 41, 48, 776 S.E.2d 687, 692 (2015) (quoting *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999)), *aff'd per curiam*, 368 N.C. 704, 782 S.E.2d 510 (2016).

In addition to the above challenged finding of fact, the trial court found numerous other unchallenged findings that show respondent repeatedly prioritized her relationship with Walter over the safety of Miranda, Megan, and Margot by continuing to allow Walter in her life and around the children; by violating court orders; and by lying to her social workers, doctors, and family members in the process. Walter has been confined for varying lengths of time during the course of the children's lives, and each time he was released, respondent welcomed him back into the home. We conclude respondent's evidence of changed circumstances does not "support different inferences and conclusions regarding the likelihood of a repetition of neglect based on evidence regarding [respondent's] circumstances at the time of the hearing." *In re A.B.*, 253 N.C. App at 35, 799 S.E.2d at 451. Moreover, respondent's refusal to acknowledge the effect of domestic violence on the children and her inability to sever her relationship with Walter, even during or immediately following his periods of incarceration, supports the trial court's determination that

the neglect of the children would likely be repeated if they were returned to respondent's care. *See In re Z.V.A.*, 373 N.C. at 212, 835 S.E.2d at 430 (affirming a finding of neglect based on a respondent's inability to sever a relationship with an unsafe parent).

Respondent also asserts that finding of fact 8 is actually a conclusion of law, and as such this Court "must assess it in the context of whether findings contained elsewhere in the TPR orders support it." Finding of fact 8 states, in relevant part, that DSS has proved "by clear and convincing evidence that grounds exist to terminate [respondent's] parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) . . . as set forth herein." We agree that this finding is better labeled as a conclusion of law. *Matter of Adoption of C.H.M.*, 371 N.C. 22, 28, 812 S.E.2d 804, 809 (2018) ("[A]ny determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law." (citation omitted)); *see also In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675–76 (1997) ("The determination of neglect requires the application of [statutory] legal principles . . . and is therefore a conclusion of law." (citation omitted)). The trial court's labels are not binding upon this Court, and we "may reclassify them as necessary before applying the appropriate standard of review." *N.C. Farm Bureau Mut. Ins. Co. v. Cully's Motorcross Park, Inc.*, 366 N.C. 505, 512, 742 S.E.2d 781, 786 (2013) (citing *In re Foreclosure of Gilbert*, 211 N.C. App. 483, 487–88, 711 S.E.2d 165, 169 (2011)).

Thus, having determined the challenged findings of fact are supported by clear, cogent, and convincing evidence, and having reviewed the findings as a whole, we conclude the findings of fact support the trial court's conclusion that DSS proved "by clear and convincing evidence that grounds exist to terminate [respondent's] parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) . . . ." *In re E.H.P.*, 372 N.C. at 392, 831 S.E.2d at 52.

Finally, respondent argues that the trial court erred as its conclusions of law do not include the phrase "probability of future neglect." She asserts this renders the orders reversible. However, the trial court did make findings regarding the probability of future neglect, stating, "It is likely that the neglect experienced by the juvenile in the care of Respondent mother will repeat or continue if the juvenile is returned to Respondent mother's care and custody," and that the juvenile was subjected to "the likelihood of repetition of neglect if the juvenile were returned to [respondent's] care and custody." Again, the trial court's labels are not binding upon this Court, and we "may reclassify them as necessary before applying the appropriate standard of review." *N.C. Farm Bureau Mut. Ins. Co.* 366 N.C. at 512, 742 S.E.2d at 786. To the extent these determinations are more appropriately treated as conclusions of law, we will consider them as such, and we conclude there are sufficient findings of fact, supported by clear, cogent, and convincing evidence, to support the trial court's conclusion that grounds existed to terminate respondent's parental rights for neglect under N.C.G.S. 7B-1111(a)(1).

For the foregoing reasons, none of respondent's arguments demonstrate that the trial court erred in terminating her parental rights. Accordingly, we affirm the termination orders.

AFFIRMED.