IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-551

No. COA 22-118

Filed 16 August 2022

Ashe County, No. 19 JT 32

IN THE MATTER OF: A.D.

Appeal by Respondent from an order entered 13 September 2021 by Judge David V. Byrd in Ashe County District Court. Heard in the Court of Appeals 8 June 2022.

*Peter Wood, for the Respondent-Appellant.*

*Reeves, DiVenere, Wright, Attorneys at Law, by Anné C. Wright, for Ashe County Department of Social Services, Petitioner-Appellee.*

*Paul W. Freeman, Jr. and Matthew D. Wunsche, for the Guardian ad Litem.*

WOOD, Judge.

¶ 1        Respondent-Father ("Father") appeals an order terminating his parental rights to his minor child, A.D. ("Allison")[1], on the ground of willful failure to make reasonable progress to correct the conditions that led to his child's removal from his care. *See* N.C. Gen. Stat. § 7B-1111(a)(2) (2021). Because we hold the evidence does not support all the findings of fact and the findings of fact do not support the trial court's conclusion that grounds existed to terminate Father's parental rights, we

---

[1] We use pseudonyms to protect the child's identity and for ease of reading.

reverse the order of the trial court.

## I. Factual and Procedural Background

Respondent-Mother ("Mother")[2] gave birth to Allison on August 5, 2019. Mother was unmarried at the time of Allison's birth. Before Allison was born, Mother was in a relationship with Father for approximately three or four months prior to becoming pregnant and for one or two months after learning she was pregnant. According to Mother, the relationship ended due to Mother's concerns that Father suffered from mental health issues and what she described as aggressiveness. Mother told Father that she was pregnant prior to Allison's birth and contacted him from the hospital after giving birth.

Seven days after Allison's birth, Ashe County Department of Social Services ("DSS") filed a petition alleging Allison to be neglected because the child tested positive for barbiturates at birth and Mother tested positive for amphetamines for which she was not prescribed. Mother admitted to using amphetamines and smoking methamphetamine during her pregnancy. The petition did not list a father for Allison. DSS was awarded non-secure custody of Allison. Two days later, at a hearing for continued non-secure custody, Mother testified that Allison's father may be Father or another individual, and subsequently, the trial court ordered Father to submit to

___

[2] Mother did not appeal the trial court's orders, and thus is not a party to this action.

DNA testing. On this same day, Mother provided DSS with a phone number to reach Father, but the phone number was disconnected. DSS was later able to locate Father through other means and served Father with an order to submit to DNA testing on September 12, 2019 while he was in the custody of the Rowan County Jail. According to Ms. Charity Ballou ("Ms. Ballou"), the foster care social worker assigned to work with Allison, DSS did not make contact with Father until mid to late October 2019. Father completed DNA testing on November 4, 2019. On November 8, 2019, Allison was adjudicated neglected based upon Mother's substance abuse. The order did not contain any findings relating to the putative father of the child. On November 21, 2019, Father received his paternity test results, which concluded the probability of Father's paternity was 99.99%.

¶ 4     During the January 10, 2020 review hearing, paternity for Allison was established. The trial court granted Father supervised, bi-weekly, one-hour visits with Allison. At the time of the hearing, Father lived with his girlfriend and her parents in Rockwell; was employed with Premier Heating and Air in Rowan County; and did not hold a valid driver's license but did have a vehicle.[3] The trial court found that "[a]t this point [Father] is not participating in a family service case plan and has just recently become involved in the child's life." The trial court concluded that the

---

[3] We take judicial notice that the distance between Father's residence in Rowan County and Allison's foster placement in Ashe County was approximately 105 miles.

best primary permanent plan of care for Allison was reunification with a secondary plan of adoption. On January 23, 2020, Father entered into a family service case plan with DSS and agreed to: maintain steady employment, obtain stable housing and transportation, communicate with DSS, take parenting classes, and attend visits with Allison.

¶ 5        At a permanency planning review hearing on February 28, 2020, the trial court found that Father was living in Rockwell, North Carolina with his girlfriend[4], but was attempting to relocate to Ashe County to live near Allison, including applying for employment in that county at Nations Inn and construction jobs. The court also found that Father did not have a valid driver's license; was working with a day labor company part-time in Rowan County; had made himself available to the court, DSS, and GAL; and had signed up for a parenting program in Rowan County. In terms of visitation, the trial court found that Father had difficulty attending his visits with Allison because of lack of transportation and had attended three visits at the time of the hearing. The trial court modified Father's supervised visitation to occur once per week for one hour and ordered reasonable efforts towards reunification with Mother and Father be made to eliminate the need for Allison's placement in foster care.

¶ 6        Father's case plan was later amended in March 2020. DSS communicated with

---

[4] The record refers to Father's girlfriend as his wife. Father and girlfriend never married.

Father to discuss "some ongoing concerns, based on collateral information that there was potentially some substance use and mental health issues." Subsequently, Father agreed to take a substance use assessment through Daymark, follow any resulting recommendations, and submit to random urine drug screens.[5] DSS then made referrals to different Daymark locations based upon the counties in which he was living between March and December 2020: namely, Rowan County, Ashe County, and Watauga County.

¶ 7 On May 16, 2020, Father entered into an agreement to pay child support for Allison in the amount of $50 per month and $25 per month towards arrears owed beginning June 1, 2020.

¶ 8 At a May 22, 2020 permanency plan review hearing, two months into the pandemic, the trial court found that Father continued to live in Rockwell at his girlfriend's parent's residence. In terms of his employment, the trial court found that he was currently unemployed but seeking employment, having previously "worked for the Coffee House Restaurant (1-2 weeks), a day labor company, [and] more recently for McDonald's (for 3-4 weeks)." Father was living off the stimulus payments, due to the COVID-19 pandemic, he and his girlfriend received. The court

---

[5] We note that other than in the trial court's TPR order, the family service case plan's requirement for Father to submit to random urine drug screens does not appear in any DSS report or prior order of the trial court.

found that Father had 1) paid all fines to have his driver's license restored; 2) completed parenting classes and obtained certification of his completion along with his girlfriend; and 3) made himself available to the court, DSS, and GAL. Because Father resided with his girlfriend and her family, the trial court found she too needed to enter into a family service case plan with DSS. The trial court also found that since the beginning of the COVID-19 pandemic, Father had participated in weekly supervised video conference calls with his daughter via Zoom, which had gone well, and had sent Easter presents to his daughter. The trial court determined that Father was participating and cooperating with the family service case plan and continued the primary permanent plan of care being reunification with a secondary permanent plan of care being adoption. Shortly after the review hearing, in approximately June or July 2020, Father ended his relationship with his girlfriend because he did not feel that she was on "the same page . . . as far as . . . providing for [Allison] and assisting [him] and [his] efforts to have [Allison] in [his] life."

¶ 9        A permanency plan review hearing was held on September 11, 2020. At the time of the hearing, Father lived at the Hospitality House located in Boone, North Carolina, and "for a period of time had to stay in a tent on the grounds of the Hospitality House due to COVID-19 restrictions." Father resubmitted an application to HUD for housing allowances, opened a bank account, and saved money for housing. In terms of employment, the court found that Father had worked for a construction

company in Boone for approximately two months. Father also received advice and help from the Director of the Hospitality House to build a support network. At the time, Father was on probation for larceny and was required to pay probation fees. The court also found that transportation was a barrier for Father and "[i]t would be easier for him to visit [Allison] every other week rather than once weekly." Father would not be eligible to apply for reinstatement of his driver's license until November 2020. From July 21, 2020 until August 6, 2020, Father was incarcerated.

¶ 10   On August 24, 2020, Father submitted to a drug screen, which according to the court, "was inconclusive due to the creatinine level being lower than normal. This could be due to kidney failure, or he tampered with the drug screen." A substance abuse assessment for Father was scheduled on August 26, 2020, but he did attend that appointment or a second appointment.

¶ 11   After the May 2020 hearing, Father attended five (one in June, two in July, and two in August) of the ten scheduled visits with Allison between the May and September hearings. According to Father, he and Allison bonded during these visits and having his daughter "helped him to want to do better." Father was also under order to pay child support, and accordingly, paid $300 towards his child support obligation on the day of the hearing. Ms. Ballou testified that during this period of time, there were "times where phone numbers would change, where we were unable to make contact, but overall, I would say that [Father] has been – at least once per

month I have been able to somehow make contact with him." Ms. Ballou further reported that during this time, "there have been times in which he has been difficult to locate or that there have been many attempts made to get that one contact in per month and then there have been other months where he has been very communicative where I have -- I would say -- regular contact with him." The court changed the primary permanent plan of care for Allison to adoption, with a secondary plan of care of reunification with her parents.

¶ 12 On December 9, 2020, DSS filed a petition to terminate Father's and Mother's parental rights to Allison. The petition, as it pertained to Father, stated that: Allison was adjudicated as neglected; Father failed to pay child support and willfully left Allison in placement outside of the home for more than twelve months without showing to the satisfaction of the court that reasonable progress was made; the trial court at no time had determined that Father was capable of providing a safe and stable home for Allison; and the trial court never approved unsupervised visitations between Allison and Father.

¶ 13 On February 5, 2021, Mother relinquished her parental rights to Allison. The trial court conducted the hearing on DSS's petition to terminate Father's parental rights on May 3, 2021.

¶ 14 At the termination hearing, Ms. Ballou testified that Father's communication with DSS was sporadic, there had been times in which Father was difficult to locate

as he moved frequently and allegedly had issues with his phones being disconnected, but that she was somehow able to contact him once per month. Ms. Ballou reported that while Father was supposed to maintain contact with her on a weekly basis, keep her informed of any changes in his residence or contact information, and notify her of changes in his employment, he only did so "[a]t times, but not at others."

¶ 15        According to Ms. Ballou, since Allison entered the care of DSS, Father had lived at eight different addresses, although not all of them had been verified by DSS. At the time of the January 10, 2020 review hearing, Father and his girlfriend were living in Rowan County and staying with his girlfriend's parents. At the February 28, 2020 permanency planning hearing, it was determined that Father and his girlfriend had moved to Watauga County and lived at a homeless shelter. Shortly after, Father lived in a hotel room paid for by DSS, and DSS purchased a tent for Father. In May 2020, Father lived at the Hospitality House in Watauga County. Father was incarcerated briefly from July to August 2020 and remained on supervised probation until January 2021. After his release from incarceration, and upon receiving HUD assistance, Father began renting a two-bedroom, single bathroom home on February 15, 2021, for a one-year lease period. At the time of the termination hearing, Father still resided at the rental home. Ms. Ballou testified that the home was well-kept; well stocked with food; and included a room for Allison

set up with provisions such as clothes, diapers, wipes, shoes, toys, a highchair, and a stroller.

¶ 16     The trial court found that Father "has had various jobs but is currently self-employed working for his neighbor." When Father's case plan was developed on January 23, 2020, Father engaged in odd jobs such as in construction and general labor, but never provided verification of employment to DSS. Ms. Ballou testified that in the Spring of 2020, DSS helped Father obtain employment at a local restaurant, but he worked there only for two or three days. In May 2020, Father reported he was working odd jobs that provided him with some income. In July 2020, Father found a full-time job working construction, was able to save money for housing, and opened a bank account. Father's income for the year of 2020 was $3,400.00. At the time of the termination hearing, Father was self-employed, working for his neighbor doing jobs in carpentry and construction. Ms. Ballou testified Father furnished verification of his employment the week before the termination hearing and provided nine bank deposit slips for jobs worked from December 2020 to March 2021. At the termination hearing, Father testified that he earned approximately $1,000 a week and had no difficulty paying his house rent, which was $450 per month after the $200 HUD monthly assistance.

¶ 17     As required by his case plan, Father completed a parenting program in May 2020. In terms of visitation, the trial court found that Father was approved to have

two supervised visitations per month with Allison, for two hours at a time. However, at a hearing on September 11, 2020, Father requested that the visits be reduced to once per month due to his work schedule, but that change was not implemented. The trial court found that since visitation began in January 2020, Father only missed a total of seven visits during the time Allison was in foster care. Ms. Ballou clarified during the termination hearing that these "missed" visits were primarily early in the case and that his visits had become more stable over time. At a May 22, 2020 permanency planning review hearing, the trial court found that since the COVID-19 pandemic, he had participated in weekly video conference calls via Zoom with Allison, which had gone well.

¶ 18    Since the September 11, 2020 permanency planning review hearing, Ms. Ballou testified that Father has been consistent in making his visits with Allison, "has been appropriate in his interactions" with his daughter, and since December, has provided food and other small gifts for Allison during the visits. Father testified, and Ms. Ballou confirmed, that he has been in contact with the Children's Council in Boone to learn about what would be developmentally appropriate for Allison's age group and "how to become a better father." Father also testified that he signed up for two additional parenting classes through the Children's Council, which were to start in Fall 2021.

¶ 19    In accordance with his case plan, Father paid the necessary fees to restore his

driver's license on March 24, 2021. Pursuant to Father's parenting plan regarding issues of substance abuse and mental health, Ms. Ballou stated she first made a referral for Father's mental health and substance abuse assessment in March 2020. Referrals were requested for Father in three different counties based upon where he resided throughout the life of the case so as to make assessments and any follow-ups more convenient for him. Father completed a virtual assessment on December 29, 2020. When asked at the termination hearing why Father took nine months to complete the assessment, Father testified that: "It's been a hard past year or so" as the COVID-19 pandemic occurred during this time which affected scheduling and transportation. Father at times lacked proper transportation; was on probation during part of this period of time; "was having to take off work quite a bit and, unfortunately, it did take some time to get the assessment from Daymark"; underwent a learning process in emailing documentation to Daymark; experienced "some phone technology issues"; and had his phones disappear or break due to his line of work.

¶ 20        As a result of the assessment, Father was diagnosed with borderline personality disorder, and it was recommended that he engage in individual therapy

and DBT[6] group therapy weekly. Ms. Ballou testified that Father attended a therapy session on January 4, 2021. While Father signed up for three group sessions in April 2021, he was a "no-show" for all sessions. Father was requested to submit to five drug screens and submitted to two of them. One of these tests was negative and the other was inconclusive. Father did not take three of the drug screens because, when DSS asked Father at visitations with Allison to take them, he stated, "he could not stay or his ride could not wait long enough for him to submit to a screen." At the termination hearing, Ms. Ballou testified that because Father did not reside in Ashe County, it was difficult to find locations "to have him go on in and screen. So, there have not been very many tests requested due to that fact."

¶ 21        Father's counsel questioned Ms. Ballou regarding her knowledge of a letter written by Father's former probation officer which was previously submitted at a February 12, 2021 hearing.[7] The letter in question stated that Father had submitted to two drug screens on December 21, 2020 and January 20, 2021, and both results

---

[6] Dialectical Behavioral Therapy or DBT is an "evidence-based treatment that brings together cognitive-behavioral strategies and acceptance-validation strategies to help individuals with intense emotional suffering and dysfunctional behaviors" and has been used in the treatment of "substance abuse, disordered eating, anger, depression, anxiety, and interpersonal difficulties." *Dialectical Behavioral Therapy*, UNC SCH. OF SOC. WORK, https://cls.unc.edu/upcoming-programs-2016-2017/clinical-lecture-institutes/dbt/ (last visited July 7, 2022).

[7] The record before us does not contain a copy of the February 12, 2021 permanency planning review hearing. However, this review hearing and the evidence that was submitted therein is consistently referred to in the TPR hearing's transcripts.

were negative.

In the termination order, the trial court found that Allison remained in the care and custody of DSS continuously since August 12, 2019, and at the time of the termination hearing, had been in the care and custody of DSS for approximately 21 months. The trial court also found that although Father had made some progress on his case plan, his progress "has not been adequate to meet the needs standing in his way to provide proper and adequate care for [Allison]." Therefore, the trial court concluded grounds existed for the termination of Father's parental rights based on Father willfully leaving Allison in foster care or placement outside the home for more than 12 months "without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of [Allison]." At disposition, the court further concluded that it was in Allison's best interests to terminate Father's parental rights. The termination order was entered on September 13, 2021, and Father entered written notice of appeal on September 23, 2021.

## II.    Discussion

Father's sole contention on appeal is that the trial court committed prejudicial error by terminating his parental rights on the ground of willfully leaving Allison in foster care, when this is not supported by clear, cogent, and convincing evidence. We agree.

## A. Standard of Review

Termination of parental rights actions consist of a two-stage process: adjudication and disposition. N.C. Gen. Stat. §§ 7B-1109, 7B-1110 (2021); *In re A.U.D.*, 373 N.C. 3, 5, 832 S.E.2d 698, 700 (2019). At the adjudicatory stage, "the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes."[8] *In re A.U.D.*, 373 N.C. at 5, 832 S.E.2d at 700 (quoting N.C. Gen. Stat. § 7B-1109(f)). We review a trial court's adjudication that grounds exist to terminate parental rights to determine "whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings support the trial court's conclusions of law." *In re A.B.C.*, 374 N.C. 752, 760, 844 S.E.2d 902, 908 (2020) (citation omitted). "The trial court's conclusions of law are reviewable *de novo* on appeal." *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006) (cleaned up). "Clear, cogent, and convincing evidence is evidence which should fully convince." *North Carolina State Bar v. Talford*, 147 N.C. App. 581, 587,

---

[8] While this Court reviews a trial court's conclusion that grounds exist to terminate parental rights under N.C. Gen. Stat. § 7B-1111(a) to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law, *In re M.P.M.*, 243 N.C. App. 41, 45, 776 S.E.2d 687, 690 (2015), the statute specifies that the burden in termination proceedings "is on the petitioner or movant to prove the facts justifying the termination by clear and convincing evidence." N.C. Gen. Stat. § 7B-1111(b).

556 S.E.2d 344, 349 (2001) (cleaned up), *aff'd as modified*, 356 N.C. 626, 576 S.E.2d 305 (2003).

In making this determination, "[u]nchallenged findings are deemed to be supported by the evidence and are binding on appeal." *In re K.N.K.*, 374 N.C. 50, 53, 839 S.E. 2d 735, 738 (2020) (cleaned up). We are bound by the trial court's findings "where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *In re Montgomery*, 311 N.C. 101, 110-11, 316 S.E.2d 246, 252-53 (1984) (citations omitted). "On appeal, this Court may not reweigh the evidence or assess credibility." *In re K.G.W.*, 250 N.C. App. 62, 67, 791 S.E.2d 540, 543 (2016) (citing *Kelly v. Duke Univ.*, 190 N.C. App. 733, 738-39, 661 S.E.2d 745, 748 (2008)). Additionally, we review "only those findings necessary to support the trial court's determination that grounds existed to terminate [Father's] parental rights." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58-59 (2019) (citation omitted).

Pursuant to N.C. Gen. Stat. § 7B-1111(a)(2), a trial court may terminate parental rights upon a finding that "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C. Gen. Stat. § 7B-1111(a)(2); *In re A.M.*, 377 N.C. 220, 2021-NCSC-42,

¶ 16.

A finding that a parent acted willfully for purposes of section 7B-1111(a)(2) "does not require a showing of fault by the parent. A [Father's] prolonged inability to improve [his] situation, despite some efforts in that direction, will support a finding of willfulness regardless of [his] good intentions, and will support a finding of lack of progress sufficient to warrant termination of parental rights." *In re B.J.H.*, 378 N.C. 524, 2021-NCSC-103, ¶ 12 (quoting *In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d 66, 71 (2020)). A "finding of willfulness is not precluded even if the [Father] has made some efforts to regain custody of the children." *In re Nolen*, 117 N.C. App. 693, 699, 453 S.E.2d 220, 224 (1995) (citation omitted). Although Allison was removed from Mother's home and placed in custody before Father's paternity was established, we have previously determined that in order for a parent to avoid the termination of his or her parental rights under § 7B-1111(a)(2), the parent is required to "make reasonable progress under the circumstances towards correcting those conditions that led to the child being placed in [DSS] custody, irrespective of whoever's fault it was that the child was placed in [DSS] custody in the first place." *In re A.W.*, 237 N.C. App. 209, 217, 765 S.E.2d 111, 115-16 (2014) (cleaned up).

To assess the reasonableness of Father's progress in correcting the conditions that led to Allison's placement into DSS custody, Father's progress is evaluated "for the duration leading up to the hearing on the motion or petition to terminate parental

rights." *In re A.C.F.*, 176 N.C. App. 520, 528, 626 S.E.2d 729, 735 (2006). "[A] trial court has ample authority to determine that a parent's 'extremely limited progress' in correcting the conditions leading to removal adequately supports a determination that a parent's parental rights in a particular child are subject to termination" pursuant to section 7B-1111(a)(2). *In re B.O.A.*, 372 N.C. 372, 385, 831 S.E.2d 305, 314 (2019) (citation omitted).

¶ 29 Our Supreme Court has held "parental compliance with a judicially adopted case plan is *relevant* in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2)" provided that "as long as a particular case plan provision addresses an issue that, directly or indirectly, contributed to causing the juvenile's removal from the parental home, the extent to which a parent has reasonably complied with the case plan provision is, at minimum, relevant to the determination" of whether that parent's parental rights are subject to termination for failure to make reasonable progress. *Id.* at 384-85, 831 S.E.2d at 313-14 (emphasis added).

¶ 30 Although Father was not a member of the child's home at the time of removal, it was appropriate for DSS to require Father to complete a family service case plan so that the child could be returned to a parent once conditions inhibiting reunification were met. Accordingly, we look at Father's progress in correcting the conditions which resulted in Allison being placed in DSS custody. *In re A.W.*, 237 N.C. App. at 217, 765 S.E.2d at 115-16.

**B. Challenged Findings of Fact**

¶ 31    Father challenges the trial court's finding of fact 10, and challenges 16 of the 42 sub-findings contained therein. Father contends the trial court's findings are unsupported by competent evidence and leave out crucial information that directly affected whether Father had made reasonable progress. The trial court made the following contested findings:

> 10. The Court finds as a fact [Father] willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile.
>
> In support thereof the Court finds as a fact that:
>
> . . .
>
> g). [Father] at no time sought paternity or custody of [Allison].
>
> h). [Mother] was very honest with the Department as to the possible fathers and provided a telephone number for [Father]. Social Worker Ballou made multiple phone calls, mailings and emails to [Father].
>
> . . .
>
> k). A court order was entered August 14, 2019, for [an individual] and [Father] to submit to DNA testing. [Father] was served with the Order to submit to DNA testing on September 12, 2019 but did not complete the testing until November 4, 2019; the results indicated the probability of paternity as 99.99%.

p). Initially [Father] was residing in Rowan County with his "wife" and her family. He had no drivers [sic] license and worked odd jobs. Later he admitted they were not married; and their relationship ended in June or July 2020.

q). While in Rockwell, NC and living with his significant other the Department sent referrals for [Father] to have an assessment at the Rowan County Daymark.

 . . .

y). Although a part of the family service case plan [Father] did not participate in a mental health/substance abuse assessment until December 29, 2020

z). [Father] admittedly has had difficulty with being criticized and feeling as if he is being judged. There are times he has an intense anger. Over the years he has had difficulty in relationships with others. He struggles with impulsive behaviors.

 . . .

dd). [Father] has had various jobs but is currently self-employed working for his neighbor. His income for the year of 2020 was $3,400.00.

ee). [Father] is approved to have supervised visitation twice monthly for two hours. He has requested once monthly visits and gave the reason it is hard for him to get off work. [Father] has missed seven visits with [Allison] since visitation began in January 2020. Transportation to/from visits has been offered and/or provided. Gas cards have been provided to [Father] to assist with the expense of traveling to/from visits.

 . . .

ii). [Father] has had inconsistent communication with the Department. There was a period of time in the spring of 2020 and 2021 that there was little if any communication.

. . .

kk). [Father] made no effort to determine paternity or establish a relationship with his daughter. Upon the [trial court] entering an order for paternity testing to be conducted [Father] did not submit to the test until November 2019.

ll). The Court finds that [Father's] progress has not been adequate to meet the needs standing in his way to provide proper and adequate care for [Allison].

. . .

nn). Substance use was the reason [Allison] came into foster care; [Father] has not attended mental health or substance use therapy as recommended by his assessments.

. . .

pp). [Father] has failed to comply with all but the most minimal requirements of his family service case plan. The limited progress made is not reasonable.

qq). Although [Father] knew prior to and after the child's birth that he might be the child's father, he did not make himself available for possible placement of the child when the child was placed in DSS custody. Indeed, he made no such efforts until the child was six months old and had been in DSS custody for all but 7 days of her life.

rr). [Father] previously denied having any relationship with the child's mother. It was only after the results of paternity testing were revealed that [Father] admitted to such a relationship.

### 1. *Sub-findings of Fact 10(g) and 10(kk)*

Father challenges sub-finding 10(g) that states, "[Father] at no time sought

paternity or custody of [Allison]" and argues that this finding was misleading and incomplete. Father also contests a similar finding, finding of fact 10(kk), which states: "[Father] made no effort to determine paternity or establish a relationship with his daughter. Upon the [trial court] entering an order for paternity testing to be conducted [Father] did not submit to the test until November 2019." Father argues that this finding is misleading.

¶ 33    It is undisputed Mother told Father she was pregnant; according to Mother's testimony, Father was present when Mother's pregnancy test results were revealed. Father was aware that Allison's delivery was successful when Mother contacted him from the hospital. However, according to sub-finding 10(c), Mother named two individuals as the possible father of Allison, with one being Father. Father testified at the termination hearing that when Mother contacted him from the hospital, he was unsure if Allison was "[his] child or if it was somebody else's child" and if Allison "was even at risk of not being born" because of Mother's lifestyle. The evidence shows that after Mother testified of Father's possible paternity at an August 12, 2019 hearing, DSS attempted to contact Father through several methods but was unable to reach him because the phone number Mother provided was disconnected. Once DSS made contact with Father in mid to late October 2019, Father completed DNA testing on November 4, 2019. According to Father, he did not know Allison was his daughter until he received the results from the DNA testing on November 21, 2019.

The evidence and the undisputed findings of fact demonstrate that Father sought paternity once he was contacted by DSS to undergo a DNA test for Allison and did so in November 2019.

¶ 34        As to the issue of custody and establishing a relationship with Allison, we hold the trial court's findings are unsupported by the record evidence. Once adjudicated as Allison's biological father, Father entered into a family service case plan on January 23, 2020, in order to pursue custody, be "reunif[ied]," and provide a safe, permanent home for his daughter. Ample record evidence demonstrates Father put forth great effort to establish a relationship with his daughter by moving across the state to be closer to her. Ms. Ballou's testimony tended to show Father has been consistent in his visits with Allison since the September 11, 2020 hearing, and during visitations, Father talks, plays, brings gifts, and acts appropriately with his daughter. Further, Father ended the relationship with his girlfriend to be reunited with his daughter. Father also obtained employment; successfully navigated the administrative process of having his driver's license reinstated; attended every permanency planning review hearing; and purchased a vehicle. Finally, Father obtained safe and appropriate housing, which included a room for Allison in his home and made some child support and arrearage payments. Therefore, we hold sub-findings of fact 10(g) and 10(kk) are not supported by clear and convincing evidence.

### 2. Sub-finding of Fact 10(h)

¶ 35 Next, Father contends that sub-finding of fact 10(h) was "not necessarily wrong, but . . . incomplete" because the sub-finding leaves out that he was homeless, difficult to track down, and only had a remote possibility of being Allison's father. Sub-finding of fact 10(h) states, "[Mother] was very honest with the Department as to the possible fathers and provided a telephone number for [Father]. Social Worker Ballou made multiple phone calls, mailings and emails to [Father]." We are unpersuaded by this argument.

¶ 36 The record demonstrates that Father's housing instability contributed to the difficulty in reaching him. Father testified that at the time he entered into a family service case plan he was seeking housing. Further, Father testified he was served with the order to obtain DNA testing while in the Rowan County jail. Ms. Ballou's testimony further confirmed that DSS tried several methods, manners, and times to contact Father without success. Mother's testimony indicated the possibility that Father might not have been Allison's father and that she provided a telephone number purported to be Father's to DSS. Therefore, we hold the trial court's sub-finding of fact 10(h) is supported by clear and convincing evidence.

### 3. *Sub-finding of Fact 10(k)*

¶ 37 Next, Father contends that sub-finding of fact 10(k) left out "crucial information" and that "[t]he [trial court's] finding makes it seem as if [Father] was trying to avoid taking the test and was denying paternity." Sub-finding of fact 10(k)

states:

> A court order was entered August 14, 2019, for [an individual] and [Father] to submit to DNA testing. [Father] was served with the Order to submit to DNA testing on September 12, 2019 but did not complete the testing until November 4, 2019; the results indicated the probability of paternity as 99.99%.

In his brief, Father argues that the "crucial information" alleged to have been omitted by the trial court's finding was that: Father stayed in contact with DSS so that together they arranged for a paternity test; Father lacked the resources to arrange for the test on his own; "[i]t appears that [Father] took the test at his first opportunity"; and DSS had difficulty locating him. We disagree.

¶ 38        Record evidence tends to show on August 14, 2019, Father and another individual were ordered to submit to DNA testing to establish paternity for Allison. Father's testimony at the hearing established that he was served with the order for a paternity test on September 12, 2019. Ms. Ballou's testimony confirmed Father completed the testing on November 4, 2019. The test results indicated that Father's probability of paternity was 99.99% and Father was officially established to be Allison's father at the January 10, 2020 review hearing. It appears that Father takes issue with just three words: "but did not" in the trial court's sub-finding of fact 10(k). While the word "and," substituted for the words "but did not," may well cast a softer impression, the chronology of events remains unchanged. We hold sub-finding of fact

10(k) is supported by clear and convincing evidence.

### 4. *Sub-findings of Fact 10(p), 10(q), and 10(y)*

Next, Father contends the trial court left out crucial pieces of information in sub-findings of fact 10(p), 10(q), and 10(y). Sub-finding of fact 10(p) states that when Father first became involved in this case, he resided in Rowan County "with his 'wife' and her family" at which point "[h]e had no drivers [sic] license and worked odd jobs. Later he admitted they were not married; and their relationship ended in June or July 2020." In contesting this sub-finding, we note that Father's brief does not cite to any authority supporting his theory or point to any evidence in the record that would establish that the trial court's sub-finding has omitted crucial information. Therefore, under Rule 28(b)(6) of North Carolina Rules of Appellate Procedure, this argument is deemed abandoned. N.C. R. App. P. 28(b)(6).

Concerning sub-findings of fact 10(q) and 10(y), Father contends that "[t]his entire situation took place during a pandemic" and many services were unavailable, causing scheduling appointments to be difficult while offices shut down and providers transitioned to working from home. Although Father's contentions are true, the record shows Ms. Ballou made referrals for Father to have a mental health and substance abuse assessment at Daymark, located in Rowan County, because Father was living there at the time. Therefore, sub-finding of fact 10(q) is supported by clear and convincing evidence in the record.

¶ 41        Regarding sub-finding of fact 10(y), Father argues that his efforts with substance abuse treatment included attending Celebrate Recovery, a faith-based support group. Father also argues that he completed a substance abuse assessment and complied with the assessment's recommendations when he was placed on supervised probation and ordered to so comply. Finally, Father contends that the disputed sub-finding does not address whether he has a current substance abuse problem.

¶ 42        According to a letter written by Father's probation officer, Father was ordered to complete a substance abuse assessment after being placed on supervised probation on February 21, 2020 for a misdemeanor larceny. Father completed the substance abuse assessment on November 24, 2020 through the TASC program.[9] Father's completion of the substance abuse assessment was also confirmed by a letter from a TASC care manager. To the extent that this sub-finding of fact implies that Father did not complete the substance abuse program until December 29, 2020, it is not supported by evidence and therefore, we disregard this specific portion of that sub-finding of fact. As to Father's participation in a mental health assessment, Father's testimony at the hearing confirmed that he did not take the assessment until the end

---

[9] The North Carolina Treatment Accountability for Safer Communities Network or TASC "provides services to people with substance abuse or mental health problems who are involved in the criminal justice system." *Treatment Accountability for Safer Communities*, N.C. DEP'T OF HEALTH & HUM. SERVS., https://www.ncdhhs.gov/assistance/mental-health-substance-abuse/treatment-accountability-for-safer-communities (last visited July 7, 2022).

of December 2020. Related to Father's mental health assessment, we hold that the portion of this sub-finding of fact relating to Father's mental health assessment is supported by the record evidence.

### 5. *Sub-finding of Fact 10(z)*

¶ 43 Next, Father contends sub-finding of fact 10(z) is unsupported. It states: "[F]ather admittedly has had difficulty with being criticized and feeling as if he is being judged. There are times he has an intense anger. Over the years he has had difficulty in relationships with others. He struggles with impulsive behaviors." Father contends this sub-finding "mentions no specific dates, and it is unclear how this finding applies to the twelve-month period before the filing of the termination petition." Despite Father's contentions with this sub-finding, the record demonstrates that Father's family service case plan was amended to include a mental health assessment and Father was to follow any resulting recommendations therefrom. Additionally, an undisputed finding indicates that Father and Mother's relationship ended due to Father's aggressiveness and Mother's concerns that Father had mental health issues. In determining Father's compliance with his case plan, there is a reasonable inference that the trial court would consider the status of Father's mental health.

¶ 44 The record also demonstrates that the trial court's sub-finding of fact is primarily based upon Father's testimony at the termination hearing. At the hearing,

Father testified that "it is definitely an uncomfortable feeling that I get sometimes when I feel put on the spot, or judged, or -- but it is something I have been able to work on and certainly something that I have been more tolerable for in the past years[.]" Additionally, Father testified that in the past, he had "some hard times developing healthy relationships and long-lasting relationships, but that is definitely something that has been improving in the last couple of years[.]" Father also stated that acting impulsively "has been an issue in [his] past, . . . that is something [he is] definitely aware of . . . [i]t is something [he] will probably work on and deal with for the rest of [his] life" and he is seeking help for it. While the sub-finding does not mention specific dates, it reflects that Father's behaviors have occurred in the past and are issues that are presently improving. Based upon the undisputed findings and the record, we uphold the trial court's sub-finding as it is supported by clear and convincing evidence.

### 6. *Sub-finding of Fact 10(dd)*

¶ 45        Next, Father contests sub-finding of fact 10(dd), which states: "[Father] has had various jobs but is currently self-employed working for his neighbor. His income for the year of 2020 was $3,400.00." Father contends this sub-finding excludes information about his progress since moving to Watauga County, as he secured full-time employment in mid-2020 and makes approximately $1,000 per week. Father's argument is in substance directed at the trial court's determination of the credibility

of the evidence presented at the termination hearing and the weighing of such evidence. *See In re P.A.*, 241 N.C. App. 53, 57, 772 S.E.2d 240, 244 (2015). At the termination hearing, Ms. Ballou testified that throughout the duration of Father's family service case plan, Father worked "odd jobs," working mostly construction and general labor. For a short period of time, Father obtained employment at a Coffee House in West Jefferson. Father's testimony also demonstrated that he has "a full-time gig" and has "been doing carpentry and construction." In terms of working in construction, Father testified that he works for himself and can be hired by many employers. For example, Father explained one of his employers is "a home builder that lives right across the street" from him. Further, Ms. Ballou testified that Father provided a copy of a 1099-NEC and a W-2 form, indicating an income of approximately $3,400 for the year 2020. Father testified he had not received proof of all of his income statements for taxes, and that he had more income in 2020 than what was indicated. However, at the time of the termination hearing, $3,400 was the income amount for 2020 that could be verified by documentation.

¶ 46        We note that it is "the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony." *In re S.C.R.,* 198 N.C. App. 525, 531-32, 679 S.E.2d 905, 909 (2009) (citation omitted). While the trial court's termination order did not include the extent of Father's detailed employment history or Father's recent income, the

"trial court is not required to make findings of fact on all the evidence presented, nor state every option it considered." *In re E.S*, 378 N.C. 8, 2021-NCSC-72, ¶ 22 (quoting *In re J.A.A.,* 175 N.C. App. 66, 75, 623 S.E.2d 45, 51 (2005)). The trial court made a "brief, pertinent, and definite finding[]" about one of the matters at issue, which is supported by evidence in the record. *In re J.A.A.,* 175 N.C. App. at 75, 623 S.E.2d at 51.

### 7. *Sub-finding of Fact 10(ee)*

Next, Father challenges sub-finding of fact 10(ee) in which the trial court found that:

> [F]ather is approved to have supervised visitation twice monthly for two hours. He has requested once monthly visits and gave the reason it is hard for him to get off work. [Father] has missed seven visits with [Allison] since visitation began in January 2020. Transportation to/from visits has been offered and/or provided. Gas cards have been provided to [Father] to assist with the expense of traveling to/from visits.

Father argues that this sub-finding of fact relies upon old information as most of Father's missed visits were in "early 2020 when he was homeless, without a driver's license, and living across the state." Father argues that since moving to Watauga County, his visitation record has been consistent, and he stopped missing visits over a year before the termination hearing.

First, the order from the September 11, 2020 permanency planning review

hearing indicates that Father was approved to have supervised visitation with Allison for two hours every two weeks. Ms. Ballou's testimony at the hearing illustrates it was recommended that Father have monthly visits with Allison and that Father desired his visitations to be reduced because "it was difficult to take off work as well as secure transportation to those visits." Although the trial court's findings do not indicate at what point in time Father missed seven visits with Allison since his visitation began in January 2020, the record accurately reflects this number of missed visitations. The trial court considered a previous permanency planning review order which states DSS "has transported [Allison] to Boone once for visitation and has offered to assist [Father] with transportation to and from visits." Ms. Ballou's testimony also demonstrated that transportation played a factor in Father attending his visitations, but that DSS did provide transportation for Father a few times. Accordingly, there was clear and convincing evidence to support sub-finding of fact 10(ee).

### 8. *Sub-finding of Fact 10(ii)*

Next, Father contends that the trial court's sub-finding of fact 10(ii) is misleading. It states that Father "has had inconsistent communication with [DSS]. There was a period of time in the spring of 2020 and 2021 that there was little if any communication." We disagree.

At the hearing, Ms. Ballou testified to Father's inconsistent communication,

explaining that as a part of his case plan, he was expected to contact her on a weekly

basis. Ms. Ballou described their communication as "sporadic" during the time of the

February 28, 2020 hearing and around the time of September 2020. Ms. Ballou

elaborated that her communication with Father was

> [a]t some points better than others, but there certainly were times where
> phone numbers would change, where we were unable to make contact,
> but overall, I would say that he has been -- at least once per month I
> have been able to somehow make contact with him. But certainly, there
> have been times in which he has been difficult to locate or that there
> have been many attempts made to get that one contact in per month and
> then there have been other months where he has been very
> communicative where I have -- I would say -- regular contact with him.

Accordingly, there was clear and convincing evidence to support the trial court's

finding of Father's inconsistent communication with DSS.

### 9. *Sub-findings of Fact 10(ll) and 10(pp)*

¶ 51        Next, Father challenges sub-finding of fact 10(ll) as misleading. It states that

"[t]he [trial court] finds that [Father's] progress has not been adequate to meet the

needs standing in his way to provide proper and adequate care for [Allison]." Father

contests sub-finding of fact 10(pp), which states: "[Father] has failed to comply with

all but the most minimal requirements of his family service case plan. The limited

progress made is not reasonable." Father argues that this finding is vague, does not

provide dates, and does not reference the progress Father made. We agree.

¶ 52        Based upon the evidence before us, Father's progress has been adequate to

address those elements in his family service case plan which would prevent him from providing care to Allison. During the course of Father's family service case plan, Father completed parenting classes in May 2020 and has continued efforts in learning "how to become a better father" by communicating with the Children's Council in Boone and signing up for additional parenting classes. Father also moved across the state to be closer to his daughter, facing homelessness to do so.

¶ 53 The record demonstrates that Father's career is in the construction industry and that he has consistently worked with employers on a contractual basis during the course of his family service case plan. According to Father, he obtained full-time employment in construction several months before the termination hearing by working for his neighbor. This employment was verified by a letter from his neighbor. The record also illustrates that Father obtained appropriate and permanent housing in February 2021, has a one-year lease on the home, is able to pay the monthly rent for the home, and has prepared a room for his daughter to live with him. The record shows that his driver's license was restored to him in March 2021 and that he purchased a vehicle in May 2021.

¶ 54 As to the substance abuse and mental health requirements in Father's case plan, Ms. Ballou testified Father's case plan was amended in March 2020 because of "some ongoing concerns, based on collateral information that there was potentially some substance use and mental health issues." Yet these allegations of "ongoing

concerns" were never explained in her testimony or noted in previous court orders, notes from DSS or GAL, or at the termination hearing. Nonetheless, Father addressed the added requirements in his amended case plan. Father took a substance abuse assessment in November 2020 and a combined mental health and substance abuse assessment through Daymark in late December 2020. According to a letter from a TASC Care Manager, Father completed two drug screens on December 21, 2020 and January 20, 2021, which were both negative. Father also joined Celebrate Recovery, a weekly faith-based recovery group, which was recommended to him by TASC services. A Celebrate Recovery group leader confirmed Father had attended group sessions since November 2020. The TASC Care Manager's letter further stated, "[t]hroughout [Father's] time in TASC it became apparent that he has taken his pursuit of a healthy, substance free lifestyle very seriously" and has "willingly engaged in services to learn skills and tools to benefit him and support him each day." We note that there is no evidence of a positive drug screen throughout the pendency of this case.

¶ 55 In terms of mental health, Father was diagnosed with borderline personality disorder, and it was recommended that he engage in individual therapy and DBT group therapy weekly. Ms. Ballou's testimony showed Father attended one therapy session and signed up for three group sessions during the month of April 2021 but did not attend any sessions. Father testified he had been in communication with a

DBT therapy leader in Watauga County and had been given "other outlets as far as finding DBT therapy that would be . . . conducive to [his] work schedule, she just found something for [him] and [he had] been communicating to her by email." Father's testimony also indicated he is aware of his impulsive behavior and is seeking help for it through attending the Celebrate Recovery classes, church, and Bible studies. Based on Father's progress in seeking help and addressing DSS's concerns regarding his unsubstantiated mental health and substance abuse issues and his sufficient progress in addressing the other elements of his case plan, we hold the trial court's sub-findings of fact 10(ll) and 10(pp) are not supported by clear and convincing evidence.

### 10. *Sub-finding of Fact 10(nn)*

¶ 56        Next, Father contends that the trial court's sub-finding 10(nn) was misleading. It states, "[s]ubstance use was the reason [Allison] came into foster care; [Father] has not attended mental health or substance use therapy as recommended by his assessments[.]" Father argues that substance abuse was a reason for Allison's removal from Mother, not Father, and that this finding is inaccurate because Father successfully complied with the "substance abuse and mental health requirements" as a condition of his probation. The record demonstrates that Mother's substance abuse was one of the reasons why Allison was placed into foster care, and we agree with Father that Allison was placed into foster care because of *Mother's* substance abuse,

not his own. However, despite Father not living with Allison at the time she was placed into foster care, Father's case plan was amended in March 2020 to include a substance abuse assessment requirement and that he follow any recommended treatments therefrom. Father's probation conditions also required him to take a substance abuse assessment through TASC services. After this assessment with TASC, Father's treatment recommendation was to go to TASC care management and attend MRT[10] weekly. TASC services then referred Father to Daymark Recovery, who recommended him to SADBT weekly group meetings and Celebrate Recovery meetings. Based upon these assessments and recommendations, Father pursued several treatment options to address his alleged mental health and substance abuse issues by attending Celebrate Recovery meetings weekly, going to TASC care management monthly, and purchasing a MRT book on his own initiative, all of which he was able to verify to the court.

¶ 57     To the extent that sub-finding of fact 10(nn) states that Father has not attended mental health or substance abuse therapy as recommended by his assessments, we hold it to be unsupported by clear and convincing evidence and overrule the sub-finding.

---

[10] MRT or Moral Reconation Therapy is described as a "cognitive-behavioral treatment system that leads to enhanced moral reasoning, better decision making, and more appropriate behavior." *About MRT*, MRT-MORAL RECONATION THERAPY®, http://www.moral-reconation-therapy.com/about.html (last visited July 7, 2022).

### 11. *Sub-findings of Fact 10(qq) and 10(rr)*

¶ 58        Finally, Father challenges sub-findings of fact 10(qq) and 10(rr) and argues that they were misleading and omitted information. Finding of fact 10(qq) states:

> [a]lthough [Father] knew prior to and after the child's birth that he might be the child's father, he did not make himself available for possible placement of the child when the child was placed in DSS custody. Indeed, he made no such efforts until the child was six months old and had been in DSS custody for all but 7 days of her life.

Sub-finding of fact 10(rr) states that Father "previously denied having any relationship with the child's mother. It was only after the results of paternity testing were revealed that [Father] admitted to such a relationship."

¶ 59        According to Mother's testimony at the termination hearing, upon learning she was pregnant, Father desired her to move with him to Statesville and told her he would visit her during the pregnancy. Father testified he was not certain he was the father of the child because Mother "was involved with several other men." In fact, Mother's testimony shows she was not certain who Allison's father was and initially gave the name of another individual as the putative father. The results of the November 2019 paternity test resolved this uncertainty. The record reflects that after Mother contacted Father to inform him of Allison's birth, Father did not receive further news concerning Allison until September 12, 2019, when he was served with an order to submit to a DNA test. The record is devoid of any evidence tending to

demonstrate Father knew of Allison's removal from Mother or her placement in DSS custody prior to DSS informing him. Likewise, while the record shows Mother contacted Father at the time of Allison's birth, there is no record evidence indicating that she informed Father of Allison's placement into DSS custody as a result of Mother testing positive for drugs at birth.

Additionally, there is no evidence in the record to support the trial court's finding that Father previously had denied having any kind of relationship with Mother. After DSS contacted Father in mid to late October 2019, Father took a paternity test on November 4, 2019. There is no indication that Father refused to take the paternity test or ever denied that he was in a relationship with Mother. Further, there was no testimony to support this finding. Therefore, we hold that the trial court lacked sufficient evidence to support its sub-findings of fact 10(qq) and 10(rr).

## C. Grounds to Terminate Parental Rights

Finally, Father contends the trial court erred by concluding that grounds existed to terminate his parental rights based upon his willfully leaving Allison in a placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress "under the circumstances has been made in correcting those conditions which led to the removal" of Allison pursuant to N.C. Gen. Stat. § 7B-1111(a)(2). We agree.

¶ 62        Although Allison remained in foster care for 21 months, we hold that the trial court's findings do not support the conclusion of law that Father has failed to make reasonable progress "under the circumstances . . . in correcting those conditions which led to the removal" of Allison.

¶ 63        Looking at the requirements of Father's family service case plan, the evidence tends to show that Father made sufficient progress in meeting each element. The trial court found Father completed his parenting classes in May 2020, and Ms. Ballou testified that Father continued to pursue opportunities to improve his parenting skills, even beyond his case plan requirement, through the Children's Council in Boone. Father's case plan required visitations with Allison. To have a relationship with Allison and to be able to have visitations with her, Father moved across the state to be closer to his daughter. Ms. Ballou testified that while Father missed some visits early on, his visits had become consistent over time. Further, Ms. Ballou's testimony tended to show that since the September 11, 2020 hearing, Father has been consistent in his visits with Allison; and during visitations, Father talks, plays, brings gifts, and acts appropriately with his daughter.

¶ 64        Father's case plan also required him to obtain stable employment and suitable housing. The record evidence shows Father obtained full-time employment in his field of construction several months before the termination hearing. The record also demonstrates Father obtained appropriate and permanent housing in February 2021,

signed a one-year lease, and had consistently paid his monthly rent. Father was also required to obtain reliable transportation. The record shows Father took the necessary steps and paid all fees to have his driver's license reinstated in March 2021. Father purchased a vehicle in May 2021.

¶ 65        Concerning the substance abuse and mental health requirements in Father's case plan, Father took a substance abuse assessment in November 2020 and a combined mental health and substance abuse assessment in late December 2020. Father was diagnosed with borderline personality disorder, and it was recommended that he engage in individual therapy and DBT group therapy. It is true that Father attended only one therapy session and signed up for three group sessions during the month of April 2021 but did not attend any sessions. However, Father has taken steps to register for DBT therapy by communicating with a DBT therapy leader who is assisting him in finding a session conducive to his work schedule. Father submitted to a number of drug tests, all of which were either negative or inconclusive. Further, Father's probation conditions also required him to take a substance abuse assessment through TASC services and comply with the recommendations, which he successfully completed.

¶ 66        After addressing the requirements of Father's case plan and the progress he has made with each one, we note a "parent's failure to fully satisfy all elements of the case plan goals is not the equivalent of a lack of reasonable progress." *In re J.S.L.*,

177 N.C. App. 151, 163, 628 S.E.2d 387, 394 (2006) (citation omitted). While Father has not met every required element in his case plan, certainly, "perfection is not required to reach the 'reasonable' standard." *In re S.D.*, 243 N.C. App. 65, 73, 776 S.E.2d 862, 867 (2015). As noted above, some portions of the trial court's findings of fact are not supported by the evidence, "and although they are just portions of the findings, they are findings on the pivotal issues." *In re S.D.*, 243 N.C. App. 65, 73, 776 S.E.2d 862, 867 (2015). When we consider the many ways Father complied with his case plan in order to correct the conditions that led to Allison's placement into custody, together with the findings of the trial court we overruled, we hold that the remaining findings of fact do not support the conclusion of law that Father has failed to make reasonable progress in correcting the conditions which led to Allison's removal and do not warrant the termination of his parental rights.

## III.   Conclusion

¶ 67       We hold that competent evidence in the record shows Father made reasonable progress in correcting the conditions which led to Allison being removed from her home and placed in DSS custody. While Father has not fully satisfied all elements of his case plan, he has *not* shown "a prolonged inability to improve [his] situation," which would warrant terminating his parental rights to Allison. *In re B.J.H.*, ¶ 12. Therefore, we conclude that the trial court's findings are not supported by clear and convincing evidence and the trial court erred in concluding that grounds existed to

terminate Father's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(2). Accordingly, we reverse the trial court's order terminating Father's parental rights to his minor child.

REVERSED.

Judges DIETZ and MURPHY concur.